The STATE of Ohio, Appellee,

v.

BERESCHIK, a.k.a. Berescik, Appellant.

[Cite as *State v. Bereschik* (1996), 116 Ohio App.3d 829.]

Court of Appeals of Ohio,
Seventh District, Jefferson County.

No. 95–JE–38.

Decided Dec. 19, 1996.

*Christopher Becker*, for appellee.

*Dennis McNamara*, for appellant.

JOSEPH E. O'NEILL, Presiding Judge.

The appellant, Regis Bereschik, came to trial before a jury, charged with trafficking in drugs, a felony of the third degree in violation of R.C. 2925.03(A)(1), and a second count of trafficking in drugs, an aggravated felony of the first degree in violation of R.C. 2925.03(A)(7).

Following deliberations, the jurors returned a verdict of guilty, and on November 14, 1995, the defendant-appellant was sentenced. A timely notice of appeal was filed.

 The first assignment of error contends that the trial judge erred when he precluded defense counsel from accessing the record.

Prior to start of trial on the second day, counsel for the defendant-appellant brought to the attention of the trial judge the fact that there had been some television coverage of the trial on the prior evening. In response to this, the trial judge ordered the jurors brought into the courtroom and addressed the jurors as follows:

"It's been reported to the court that there's been some viewing on—on the television concerning this case last night. I hope most of you were doing what I was doing, watching the Series on TV and not listening to the local news but there was a very—it's been alleged here to the court that a very serious television exposure by somebody that would have a reflection on this case. Did any of you—either channel, Channel 7 or Channel 9, did any of you view that or happen to be tuned in to that channel at the time?

"MRS. GABRIEL: Just the very tail end of it.

"THE COURT: Wait a minute. Don't say a word. Just raise your hands.

"(The following jurors indicated yes: Mrs. Gabriel and Mrs. Spence)."

The prosecutor and counsel for the appellant were asked if they desired to ask the panel any further questions and counsel for the defendant-appellant responded:

"No. We agree with the court's questioning of the jury. Thank you."

The trial judge then excused the rest of the panel and asked that jurors Ruth Gabriel and Tammy Spence remain in the courtroom. The judge then separated the two jurors and proceeded to question Gabriel:

"THE COURT: Now, Mrs. Gabriel, will you tell us what you viewed or what you saw?

"MRS. GABRIEL: I saw the very end of it where somebody was raising cane with Mingo for paying his salary for what he was doing and then there was something to the effect that they wanted this other guy to take the drug test. I was not watching. I just was kind of going through and saw this.

"THE COURT: How—How long did you view it?

"MRS. GABRIEL: That's all I heard on it. I don't know what the lead-up was.

"THE COURT: What channel were you tuned in to?

"MRS. GABRIEL: I have no idea.

"THE COURT: Who were—who was depicted in the television—on the screen, what personalities, what person?

"MRS. GABRIEL: I'm thinking it was the Mayor of Mingo and somebody that was against—I don't know who this somebody was, was against Mingo paying this agent $40,000.00 a year.

"THE COURT: Well, you never recognized anybody else on the screen?

"MRS. GABRIEL: No, I wasn't watching it that close. As I said, I just went through and recognized this gentlemen and—

"THE COURT: Well, who was doing the—who was doing the verbal—that is the oral of the talking? You said you heard those statements?

"MRS. GABRIEL: I wasn't paying that close attention. I believe it was the Mayor of Mingo speaking back to this other guy, requesting him to take the drug test or whatever it was that he wanted done.

"THE COURT: There was no commentary by anybody else?

"MRS. GABRIEL: I didn't hear it if there was. It was just a quickie and it was just right at the end of the thing. I think that was done then.

"THE COURT: Now the fact that you heard what you heard, to the extent that you heard it as you've explained it here, does that have any bearing on you—

"MRS. GABRIEL: No.

"THE COURT:—sitting as a fair an impartial juror?

"MRS. GABRIEL: No."

After this colloquy, counsel for the defendant-appellant stated to the trial judge:

"We're satisfied as well, your honor. Thank you."

The juror Tammy Spence was brought into the courtroom, and in response to the judge's questioning as to what she had viewed on television, she responded:

"All I actually saw, it was the very end of it I guess because I just saw the defendant's face because I even said I didn't see any cameras in here. I didn't think it was even on the news. I turned the news on just to see the weather. So, I didn't hear anything. It was the very end of it because it was gone."

Spence also related to the trial judge that she had heard none of the comments on what had been presented on television. The trial judge then instructed the juror to rejoin the panel and not to speak about anything that had occurred in the courtroom.

There was no response to this interrogation by either the prosecutor or counsel for the defendant-appellant.

Subsequent to the guilty verdicts being returned on October 27, 1995, there was a hearing before the trial judge on November 6, 1995. A search of the original papers certified by the clerk does not reflect that any motion was ever filed in the clerk's office. Based upon the colloquy at this hearing, apparently the judge, the prosecutor, and counsel for the defendant-appellant were discussing and arguing some type of motion requesting a mistrial. There was also discussion about a new trial. It is apparent from the discussion at this hearing that counsel had somehow obtained tapes of the news broadcast that had been the subject of the voir dire during the trial. Basically, counsel for the appellant was arguing that the two jurors who submitted to voir dire did not answer the judge's questions truthfully and further argued that perhaps other jurors had withheld from the court that they had observed the television news program in question. It is obvious from the discussion that counsel for the defendant-appellant was requesting the trial judge to assume many things, to assume that the whole panel had perhaps been prejudiced by the news report and to assume that the two jurors who had been voir dired had been prejudiced by the report. It must be borne in mind that at the conclusion of the voir dire, counsel for the defendant-appellant stated to the trial judge that he was satisfied with voir dire.

To reverse course after conclusion of the trial and discharge of the jurors and raise again the argument of prejudice is simply not reasonable. A trial judge

has great discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning a trial. *Marshall v. United States* (1959), 360 U.S. 310, 312, 79 S.Ct. 1171, 1172–1173, 3 L.Ed.2d 1250, 1251–1252. Abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149.

Considering all the circumstances surrounding this issue during the trial and during posttrial action, we cannot conclude that the trial judge in any way abused his discretion in denying a motion for mistrial or a motion for new trial.

■ The appellant appeared for sentencing on November 14, 1995 with new counsel. Counsel for the appellant stated to the court that it was his understanding that the court had requested that two tapes of two news broadcasts be furnished to the court and that they had as a matter of fact been furnished. Counsel then went on to state:

"It would be my request that they be marked as exhibits in connection with the motion for new trial and made a part of the record just so that they will be available for review by the court of appeals."

In response, the court stated, "Both videos were viewed by counsel before the verdict was received."

Counsel argued that the trial judge had viewed these tapes prior to his disposition of the motion for mistrial or new trial. In response, the trial judge stated:

"The court made its decision on the responses that the jury—members of the jury gave the court with regard to that motion. So I'm going to deny your motion to have those tapes admitted."

Defense counsel then requested that he be permitted to proffer the two tapes. In response to this, the trial judge stated:

"I don't believe they should be marked. I think the court will keep them in the court's custody. That's what I intended to do from the very beginning."

We cannot conclude that this was prejudicial on the part of the trial judge. Because he responded that he had made his decision based upon the testimony of the jurors and not on the tapes, it must be concluded that the tapes were not relevant to this case. Furthermore, if there was to be a proffer of these tapes, it should have been made at trial or on the hearing of the posttrial motion.

The first assignment of error is without merit.

■ The second assignment of error complains that the trial court erred when it excluded the testimony of Kathy Duncan.

Frank Forst testified in behalf of the prosecution. At the close of the prosecution case, counsel for both the defendant-appellant and the prosecutor brought to the judge's attention the fact that there had been a motion *in limine* filed relative to a proposed witness Kathy Duncan. It is obvious from what was stated to the judge that defendant-appellant wanted to present Kathy Duncan to testify to various facts having to do with the defrauding of an elderly woman by Forst. It was agreed by counsel for the defendant-appellant that the witness Forst had never been convicted of defrauding the elderly woman or even arrested. Evid.R. 608(B) states:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence."

▪ Appellant argues that that rule has no application to this assignment of error but that rather Evid.R. 616 applies. That rule reads as follows:

"Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

Appropriately, the defendant-appellant points out in his brief that bias arises when a witness has potential trading assets to barter with the state. Counsel for the appellant argued that the crimes of embezzlement against some older lady by the witness Forst "were brought to the prosecutor's office and it's my understanding that things are going to happen after he (Forst) testifies, that there's going to be charges filed against him, whether through information or indictment." In response to this contention, the prosecutor adamantly objected to that assumption:

"Your Honor, I object to what Mr. Hargrove thinks may or may not happen. I know of no pending criminal case investigation in the possession of any law enforcement agency in this county that has not been reviewed relating to Mr. Forst and is currently waiting to be brought to my office and what—what happens in the future is certainly not relevant to—to the testimony as it relates today. The sun may burn out tomorrow."

During cross-examination of Forst, the following colloquy took place:.

"Q What deals, sir, if any, were made to you to testify?

"A Repeat the question.

"Q What deals, if any, were made—

"A No deals.

"Q—to you?

836

"A —were given to me?

"Q None at all?

"A No, none."

Subsequently, this issue was further pursued during cross-examination:

"Q You've done nothing wrong; have you?

"A I haven't got no charges filed against me.

"Q My question, sir, was have you done anything wrong?

" * * *

"A I have no charges filed against me, if that's what you mean. What do you call wrong?

"Q Mr. Forst, were you told that charges would not be filed against you if you testified?

"A No.

"Q No deal was made?

"A No deal was made, no."

On redirect examination by the prosecutor, the following dialogue took place:

"Q Mr. Forst, I'll be pretty brief with you. What type of crimes are you charged with right now?

"A Nothing. I have no crime against me. I've never been charged with a crime in my life."

It is difficult to determine, based upon the argument of counsel and the testimony of Forst, exactly what he was trading with the prosecution that would result in bias on his part. We are further hampered by the fact that counsel did not proffer into the record exactly what Kathy Duncan would have testified if the appellant had been permitted to present her.

This second assignment of error is without merit.

■ Assignment of error number three contends that the trial judge erred when he failed to declare a mistrial during the testimony of informant Frank Forst.

During cross-examination of the witness Forst, the following colloquy took place:

"Q Sir, isn't it a fact that you bought or obtained this cocaine from some other source?

"A No.

"Q That's not true?

"A No, that's not true.

"Q And isn't it a fact, sir—

"A I'll take a polygraph test to prove to the court and everything I didn't— where it come from.

"MR. HARGROVE: Judge—

"A You want me to do that, I'll do that.

"MR. HARGROVE: Asked to strike nonresponsive.

"THE COURT: That answer is stricken. It's not responsive. Wait for a question and answer the question."

Counsel for the appellant simply asked the trial judge to strike the answer of the witness as being unresponsive. In response to this motion, the judge ordered that the answer be stricken. There was no motion for a mistrial and no motion for a further curative instruction. During general instructions, the trial judge instructed the jury as follows:

"Statements and answers that were stricken by the court or which you were instructed to disregard are not evidence and must be treated as though you never heard them. You must not speculate as to why the court sustained an objection to any question or what the answer to such question might have been. You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered."

■ As a reviewing court, we presume that the juror followed the trial judge's curative instructions. *State v. DePew* (1988), 38 Ohio St.3d 275, 284, 528 N.E.2d 542, 553.

During his instructions, the trial judge instructed the jurors on the manner in which they were to test the credibility of witnesses. Some common sense must be attributed to the jurors. Jurors are the best and only judges of credibility.

The third assignment of error is overruled.

■ Assignment of error number four complains that the trial court erred in admitting testimony that the defendant-appellant had previously been the subject of a drug investigation.

John Myers, an employee of the Mingo Junction Police Department and a secret service officer for the Jefferson County Prosecutor's Office, was presented by the prosecution as witness. During direct examination, the following dialogue took place:

"So, in October of 1994 you were working for both the Mingo Junction Police Department and you were also working as a secret service officer through the Jefferson County Prosecutor's Office; correct?

"A Yes, sir.

"Q Okay. Sometime in 1994 or maybe even in 1993, did you run across in terms of your duties as in both of those positions or either one of those the name Regis Bereschik?

"A Yes, sir.

"Q And how did that name come out or become known to you?

"A Mr. Bereschik's name came about during a drug investigation in the Summer of 1994 involving another individual.

"Q And who was that other individual?

"A Kimberly Hosenfeld.

"Q Then again later on after that did Mr. Bereschik's name come to your attention again?

"A Yes, sir.

"Q And how did that come about?

"A That was October 24th of 1994. I was approached by an agent with the— working for a federal law enforcement agency indicating to me that he had an individual that could help me with Rege Bereschik."

There was no objection to this testimony.

We are not convinced that this testimony amounted to information or statements relative to other crimes, wrongs or acts committed by the defendant-appellant Evid.R. 404(B) provides:

"(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The investigation of another individual does not lead to a conclusion of other acts or other crimes. We do not conclude that any prejudice arose as the result of this information, and additionally, we overrule this assignment of error for failure to object. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

■ The fifth assignment of error complains that the trial court erred when the judge admitted into evidence State's Exhibit No. 1, 3, and 4. Frank Forst, a

witness called by the prosecution testified that, in various conversations with the defendant-appellant Bereschik, he was wearing a body wire and recorded those conversations. State's Exhibit No. 1 is a transcript of those taped conversations. State's Exhibits No. 3 and 4 are the cassette tapes upon which the conversations were recorded.

At the close of the prosecution's side of the case there was a discussion between counsel and the trial judge having to do with these exhibits. During that discussion, there was no objection by defense counsel to those exhibits.

At the close of the defense case, the defendant-appellant moved to place into the evidence various work records of the defendant-appellant. The prosecution objected, contending that he had never been informed during the discovery phase that the defendant-appellant intended to introduce these work records.

The trial judge sustained the objection by the prosecutor, and the following colloquy took place:

"MR. HARGROVE [Counsel for appellant]: Judge, therefore, I would object as far as any of the—the State exhibits going back to the jury room on Mr. Becker's reasoning.

"THE COURT: Pardon me?

"MR. HARGROVE: I would make a similar objection to all the exhibits that have been moved into evidence that they not go back to the jury room because they've already heard them here.

"THE COURT: Well I think anything that's been admitted can go to the jury room.

"MR. HARGROVE: It's—if you let the prosecution put evidence in and don't permit us to put evidence in—

"THE COURT: No. Their—I didn't even hear any objections to their—their exhibits.

"MR. HARGROVE: I objected.

"THE COURT:—when they were—at the time they were admitted.

"MR. HARGROVE: I objected to the transcript and I objected to the—

"THE COURT: Once they're admitted they go to the jury room. That's purpose for admission.

"MR. HARGROVE: Alright. I would just note an exception then that this record should go back."

During direct examination of Forst, the prosecutor played State's Exhibit No. 3, one of the tape recordings. Following the playing of this tape, there was then

further direct testimony relative to what was depicted in the tape. There was no objection to the playing of tape. This Exhibit No. 3 was played for the court and for the jury. Forst went on to testify that he had been furnished copies of the tapes and that he had had an opportunity to review them, and that the correctly recorded conversations between him and the defendant-appellant. The prosecution then played State's Exhibit No. 4., another audio cassette tape. Forst again testified that tape number four was correct depiction of a conversation between him and the defendant-appellant that took place on October 31, 1994. Again there was no objection to the presentation of this tape to the jurors. Forst identified this tape as a correct recording of a conversation he had with the defendant-appellant on November 2, 1994.

It is the responsibility of every litigant to object to the introduction of incompetent evidence with reasonable promptness at the time it is offered or admitted. 89 Ohio Jurisprudence 3d (1989) 192, Trial, Section 155. Evid.R. 103(A)(1) provides:

"In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."

" * * * One cannot permit incompetent evidence to be introduced without objection or without seeking to have the same excluded with reasonable promptness, and at the conclusion of the trial, especially after argument in which it is to be presumed that such evidence together with all other evidence was analyzed and discussed before the jury, predicate error upon refusal of the court to exclude such evidence from the jury at that stage of the trial." 4 Ohio Jurisprudence 3d (1978) 323, Appellate Review, Section. 152.

"To take advantage of the admission of improper testimony into evidence, one must object to the admission in the lower court. An objection that might have been taken to evidence produced at trial in the court below, but which was not taken, will be considered as waived, and will not be noticed on review." *Coffey v. Shenk* (1974), 39 Ohio App.2d 156, 164, 68 O.O.2d 352, 356, 316 N.E.2d 917, 923.

In view of the fact that counsel for the appellant did not object to these exhibits when they were introduced and did not object when they were moved for admission, it follows that any error involved in these exhibits has been waived.

We must also take notice of the following statement in the appellant's brief:

"The transcript and tapes in the present case have no independent probative value as to the matters in dispute. Without reading the transcript of the entire trial, the tapes and transcripts of the tapes have no probative value because they are simply unintelligible."

Assignment of error number five is found to be without merit.

Assignment of error number six contends that the trial court erred when it instructed the jury that the defendant could be convicted if it found that he sold or offered to sell cocaine.

The defendant-appellant came to trial upon a two-count indictment. The first count charged that the defendant-appellant did knowingly sell or offer to sell cocaine, a Schedule II controlled substance, in amount less than the minimum bulk amount in violation of R.C. 2925.03(A)(1) and against the peace and dignity of the state of Ohio. The second count charged that on or about October 31, 1994, the appellant did knowingly sell or offered to sell cocaine, a Schedule II controlled substance, in an amount equal to or exceeding three times the bulk amount but in an amount less than one hundred times that amount, in violation of R.C. 2925.03(A)(7).

The trial judge instructed the jurors as follows:

"Now, on the first count of this indictment, before you can find this defendant guilty, you must find beyond a reasonable doubt that on or about the 24th day of October, 1994 and in Jefferson County, Ohio, this defendant knowingly sold or offered to sell cocaine in an amount less than a minimum bulk amount in violation of Sec. 2925.03(A)(1) of the Ohio Revised Code.

"Now, in the second count of this indictment, before you can find this defendant guilty on the second count, you must find beyond a reasonable doubt that on or about the 31st day of October, 1994, in Jefferson County, Ohio, this defendant knowingly sold or offered to sell cocaine in an amount equal to or exceeding three times the bulk amount but in an amount less than a one hundred times that amount in violation of Sec. 2925.03(A)(7) of the Ohio Revised Code."

The appellant argues that this instruction did not go far enough and contends that the jurors may not have agreed as to the means in which the offense occurred. The appellant states in his brief "some of the jurors may have concluded that Mr. Bereschik committed the offense when he offered to sell cocaine, other jurors may have concluded that Mr. Bereschik committed the offense when he actually sold the cocaine." The appellant goes on to say, "Hence, Mr. Bereschik may have been convicted by a less than unanimous jury."

The trial judge went on, during his instructions, to instruct the jury relative to the essential elements of each of the two charges and very specifically instructed the jury that the state had to prove each one of those elements. He defined bulk amount, he defined knowingly, and he defined offer, as each of these applied to each charge.

During deliberations, the jurors posed a question to the trial judge: "Does the law stipulate that intent of sale of cocaine carry the same responsibility as the actual delivery of drugs under the Ohio law?" The trial judge answered this

question by again instructing the jurors as to the elements of each of the charges and the definition of all of the phrases used in those charges. At the conclusion of this supplemental instruction, counsel for the appellant agreed that the judge had adequately answered the question.

Based upon the extensive instructions by the trial judge, we cannot assume or presume that the jurors were in any way misled into compromised jury verdicts. We further note that there was no objection to the general instructions, and, in fact, there was affirmative agreement with the supplemental instructions.

This sixth assignment of error is found to be without merit.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

GENE DONOFRIO and COX, JJ., concur.