[Cite as *State v. Bigsby*, 2013-Ohio-5641.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                                )
                                              )
    PLAINTIFF-APPELLEE,                       )
                                              )      CASE NO. 12 MA 74
V.                                            )
                                              )      OPINION
BRIAN BIGSBY,                                 )
                                              )
    DEFENDANT-APPELLANT.                      )

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Court of Common
      Pleas of Mahoning County, Ohio
      Case No. 10CR805

JUDGMENT:      Affirmed

APPEARANCES:
For Plaintiff-Appellee      Paul Gains
      Prosecutor
      Ralph M. Rivera
      Assistant Prosecutor
      21 W. Boardman St., 6th Floor
      Youngstown, Ohio 44503

For Defendant-Appellant      Attorney Joshua R. Hiznay
      1040 S. Commons Place, Suite 202
      Youngstown, Ohio 445145

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: December 12, 2013

DONOFRIO, J.

{¶1} Defendant-appellant, Brian Bigsby, appeals from a Mahoning County Common Pleas Court judgment convicting him of two counts of felonious assault, two counts of aggravated burglary, and domestic violence, following a jury trial.

{¶2} In the early morning hours of April 27, 2007, Erica Stewart was asleep in her Youngstown home when she heard knocking at her door, followed by knocking on her window. At her window, Stewart asked who was there. Appellant replied. Also asleep in Stewart's house at the time were her boyfriend, Vincent Franklin, and her two daughters Breyona, who was eleven years old, and Brianne, who was a year old. Appellant is Brianne's father.

{¶3} According to Stewart, she opened the door slightly and asked appellant what he wanted. She did not invite him inside because her boyfriend was there. When she told appellant this, he pushed the door open and punched her in the face. Appellant then went into Stewart's bedroom and confronted Franklin. Stewart went into the bedroom too and appellant hit her again. Appellant continued to punch and kick Stewart and at some point hit her in the knee with a baseball bat, which she kept in the house. Stewart eventually passed out. She awoke when the police arrived. By that time appellant was gone.

{¶4} According to appellant, he went to Stewart's house after having been out with some friends. He knocked on the door and Breyona let him in. He then walked into Stewart's bedroom and saw Franklin holding his daughter. Appellant told Franklin to put his daughter down, which he did, and then the two began to exchange words. Stewart hit appellant in the back and he reacted by turning around and punching her two or three times in the face. After realizing what he had done, appellant apologized to Stewart and left her house.

{¶5} Appellant fled Ohio approximately a week after the incident and was apprehended in California in July 2010.

{¶6} Stewart's injuries required one surgery to repair her torn eyelids and two other surgeries to repair her broken kneecap.

{¶7} A Mahoning County Grand Jury indicted appellant on one count of

felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1)(D); one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(2)(D); one count of aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(1)(B); one count of aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(2)(B); and one count of domestic violence, a fourth-degree felony in violation of R.C. 2919.25(A)(D).

{¶8} The matter proceeded to a jury trial on February 21, 2012. The jury found appellant guilty of all five counts. At a later sentencing hearing, the trial court merged the two felonious assault counts and the domestic violence count for purposes of sentencing. Likewise, it merged the two aggravated burglary counts. The court went on to sentence appellant to eight years for felonious assault and ten years for aggravated burglary, to be served concurrently for a total of ten years in prison.

{¶9} Appellant filed a timely notice of appeal on April 12, 2012.

{¶10} Appellant raises five assignments of error. His first two assignments of error assert that his convictions are against the manifest weight of the evidence. Thus, they share the same standard of review.

{¶11} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶12} Yet granting a new trial is only appropriate in extraordinary cases

where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶13} Appellant's first assignment of error states:

THE TRIAL COURT ERRED IN FINDING APPELLANT BIGSBY GUILTY OF FELONIOUS ASSAULT AS THAT FINDING IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} We must examine the evidence introduced at trial to determine if the jury lost its way in finding appellant guilty.

{¶15} Stewart was the first witness. She stated that she and appellant had been in a relationship that ended in November 2006. (Tr. 297). By April 27, 2007, she was in a new relationship with Vincent Franklin. (Tr. 297-298). Stewart testified that on the night in question, she was asleep in her downstairs bedroom with Franklin. (Tr. 298). Her older daughter, Breyona, was asleep in her upstairs bedroom and her younger daughter, Brianne, was asleep in her crib in Stewart's room. (Tr. 298).

{¶16} Stewart testified that she was awoken by a knocking on her door and then on her window. (Tr. 298-299). She realized that it was appellant and went to the door. (Tr. 299). Stewart opened the door slightly and asked appellant what he

wanted. (Tr. 300). She did not invite him in because Franklin was in her bedroom. (Tr. 300). When she told this to appellant, he pushed the door open and punched her in the face. (Tr. 300).

{¶17} Appellant entered Stewart's house. (Tr. 301). He punched appellant again in the eye, tearing her eyelid. (Tr. 302). Appellant then went into Stewart's bedroom and confronted Franklin. (Tr. 304). Stewart went into the bedroom and appellant punched her in the face again. (Tr. 304). By this time, both of her eyelids had been torn and she had blood in both of her eyes. (Tr. 304). As a result, Stewart could not see. (Tr. 305). She attempted to make her way to the bathroom and tried to close the door but appellant pushed it open and punched her repeatedly. (Tr. 305-306). Stewart got out of the bathroom and went to her bedroom where she heard her daughter crying in her crib. (Tr. 308). She felt appellant hit her several more times and then she felt pain in her knee. (Tr. 309). She stated it was from a baseball bat. (Tr. 309-310). Stewart stated that she keeps a baseball bat in her hall closet. (Tr. 307). She then felt more hits in the back of her legs with a bat. (Tr. 310). Stewart stated that when she was on the ground appellant continued to hit her and stomp on her. (Tr. 311). Stewart eventually passed out. (Tr. 313). She was awoken by the police ringing her doorbell. (Tr. 313).

{¶18} As a result of the beating by appellant, Stewart testified she required surgery to her eyelids to stitch them back together. (Tr. 315). She was left with several scars on her face, legs, and shoulders. (Tr. 316). She showed some of her scars to the jury. (Tr. 413). She required two surgeries on her knee and underwent physical therapy. (Tr. 317). She also required a knee immobilizer. (Tr. 318). Stewart stated that since the attack, she has sensitivity to light, she developed cataracts, and she gets severe headaches. (Tr. 319-320). Stewart described the pain in her head after the attack as "excruciating" and stated that on a scale of one to ten, her headaches were a ten. (Tr. 318-320). She stated that the pain was the most severe pain she had felt in her life. (Tr. 318).

{¶19} On cross-examination, Stewart admitted she never saw appellant hit

her with the bat because her eyes were filled with blood and she could not see. (Tr. 361-362). She stated that at that time she did not know what appellant was hitting her with; she only knew that he was hitting her. (Tr. 362). She stated she learned it was a bat that appellant hit her with when she heard Breyona tell this to the police. (Tr. 362-363).

{¶20} Breyona was the next witness. She stated that on the night in question she was asleep in her upstairs bedroom when she heard the doorbell. (Tr. 417-418). She then heard Stewart tell appellant that he had to leave. (Tr. 418). Next, Breyona heard appellant "barging his way in." (Tr. 418). She stated she ran downstairs and caught a glimpse of what was going on. (Tr. 418). Specifically, she saw appellant hit Stewart with a bat. (Tr. 419). Breyona stated she did not stay to watch. (Tr. 419). Instead, she sneaked out of the house and went next door where she called the police. (Tr. 419-420). She waited at the next-door neighbor's house until the police arrived. (Tr. 420-421). From the neighbor's house, Breyona testified that she saw appellant chasing Franklin down the street with a bat. (Tr. 422).

{¶21} The next witness was Youngstown Police Officer Robert Martini. Officer Martini, along with his partner, was the first officer to arrive at Stewart's house. As he was exiting his cruiser, Breyona ran up to him. (Tr. 438-439). He stated Breyona was frantic and told him her mother was injured in a fight with appellant. (Tr. 440). Officer Martini knocked on Stewart's door and she answered it. (Tr. 441). Due to the amount of blood and Stewart's swollen eyes, Officer Martini initially thought there had been a shooting. (Tr. 441). Stewart told the officer that appellant was the one who had caused her injuries. (Tr. 442). Officer Martini stated that Stewart's eyes were swollen shut, her knees were hurt, and she was shaking. (Tr. 442).

{¶22} In describing the house, Officer Martini testified there was blood splatter on the wall by the bathroom and in the bedroom, blood on the bed sheets, and blood near a baseball bat located by the bed. (Tr. 443-444). Officer Martini stated that Stewart told him that she was hit with a baseball bat. (Tr. 447). Officer Martini also

testified that a car was left in Stewart's driveway that was registered to a Charles Bigsby. (Tr. 450).

**{¶23}** On cross-examination, Officer Martini stated that Breyona told him that she was upstairs, she heard the fight, and she heard Stewart ask appellant not to hit her. (Tr. 461). She did not tell him that she witnessed any of the fight. (Tr. 461).

**{¶24}** Youngstown Detective-Sergeant Steve Schiffhauer testified that appellant was ultimately apprehended in California in July 2010. (Tr. 470).

**{¶25}** Appellant testified in his own defense. Appellant stated that he and Stewart had been seeing each other in the months preceding the night in question. (Tr. 489-490). On the night in question, appellant testified he had been out with some friends and then went to Stewart's house. (Tr. 491). He stated he knocked on the door and rang the doorbell and Breyona answered the door. (Tr. 492). Appellant said hello to Breyona and went into the house. (Tr. 494). He went into Stewart's bedroom and saw a man holding his daughter. (Tr. 495). Appellant told the man to put his daughter down and get out. (Tr. 496). Appellant stated the man threw his daughter on the bed and walked toward him. (Tr. 497). The two men began to argue and Stewart then hit appellant on the back. (Tr. 497). As a result, appellant punched Stewart two or three times in the face. (Tr. 497). Appellant stated that he saw that Stewart's nose was bleeding so he apologized. (Tr. 498). He then picked up his daughter, put her in her crib, and left. (Tr. 499). Appellant denied ever seeing a bat or using a bat to hit Stewart. (Tr. 502-503).

**{¶26}** Appellant testified he was distraught because he had hit Stewart and he knew trouble was coming so he left town. (Tr. 500). He went to Atlanta and then to California. (Tr. 500-501). He did not return to Youngstown until he was arrested in California and transported back by police. (Tr. 501).

**{¶27}** On cross-examination, appellant admitted to a prior domestic violence conviction where Stewart was the victim. (Tr. 504). He also admitted that he left town because he knew he was going to be in trouble. (Tr. 516-517).

**{¶28}** Dr. Brian Gruber, the director of trauma and critical care at St. Elizabeth

Hospital, was the last witness. Dr. Gruber admitted Stewart to the hospital. (Tr. 522). He testified Stewart had a fractured patella that required surgery. (Tr. 525-526). He stated she also had lacerations to her eyelids that required surgery to repair. (Tr. 527, 531-532). She also had multiple abrasions on her body. (Tr. 531). Dr. Gruber stated the medical history taken at the hospital indicated that Stewart's baby's father broke into her house and beat her with a baseball bat. (Tr. 528).

{¶29} The jury convicted appellant of two counts of felonious assault. The first count was in violation of R.C. 2903.11(A)(1), which provides that no person shall knowingly "cause serious physical harm to another." The second count was in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly "cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶30} "Serious physical harm" includes physical harm that carries a substantial risk of death; or that involves some permanent incapacity or temporary, substantial incapacity; or that involves permanent disfigurement or temporary, serious disfigurement; or that involves acute pain of such duration as to result in substantial suffering. R.C. 2901.01(A)(5)(b)(c)(d)(e). "Physical harm" includes any injury regardless of its gravity or duration. R.C. 2901.01(A)(3).

{¶31} As to his felonious assault conviction, appellant asserts the record is devoid of evidence that he inflicted any kind of permanent incapacity on Stewart or any temporary, substantial incapacity or any permanent disfigurement. Appellant also asserts the state failed to prove that he caused physical harm by means of a deadly weapon. He notes that the baseball bat he allegedly used as a deadly weapon was not introduced into evidence. He further notes that no fingerprint or DNA testing was performed on the bat and it did not appear that there was any blood on the bat. And he points out Stewart testified that she was unsure whether she was hit with the bat. Finally, appellant argues that Breyona's testimony was not believable because she did not see much and ran out of the house to call the police.

{¶32} As to the first felonious assault count, the evidence is clear that

appellant knowingly caused serious physical harm to Stewart. Stewart testified that appellant's beating left her with several scars that were still visible almost five years after the attack, which she showed the jury. Thus, she suffered permanent disfigurement. Additionally, she described the pain in her head after the attack as "excruciating" and noted that she had never felt pain that severe in her life. Furthermore, the jury could have inferred that she suffered temporary, substantial incapacity due to her two knee surgeries, the knee immobilizer, and the physical therapy. This evidence was all uncontroverted.

{¶33} As to the second felonious assault count, numerous courts have held that a baseball bat, when used as a weapon, can be a "deadly weapon" for felonious assault purposes. *State v. Clouse*, 10th Dist. No. 11AP-857, 2012-Ohio-3471, ¶35; *State v. Andrews*, 8th Dist. No. 93104, 2010-Ohio-3864, ¶14; *State v. Acevedo*, 11th Dist. No. 2002-A-0109, 2005-Ohio-3267, ¶25; *State v. Roberts*, 6th Dist. No. S-04-003, 2004-Ohio-6468, ¶¶12-13. There was some conflicting evidence as to whether appellant actually used the bat to hit Stewart. Appellant testified that he did not use a bat, but only punched Stewart in the face. Breyona, however, testified that she saw appellant strike Stewart with a bat. But she also testified that she saw appellant chase Franklin down the street with the bat, which was likely incorrect since the police found the bat in Stewart's house. And Stewart, although she could not see due to the blood in her eyes, believed that appellant hit her in the knees with the bat. Moreover, the police found the bat on the floor in Stewart's bedroom with blood near it. And in appellant's medical history reported at the hospital it stated that she was struck with a bat by appellant.

{¶34} While an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give great deference to the fact finder's determination of witnesses' credibility. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶11. The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and

voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.*

**{¶35}** In this case, the jury found appellant's testimony to be less credible than Breyona's testimony. Even though there was an inconsistency between Breyona's testimony and the location of the bat, the jury must have found her testimony more credible. This could be due to the fact that appellant believed she was struck in the knees with a bat, the medical history indicated that she was struck with a bat, and the bat was located in Stewart's bedroom near a blood splatter. Additionally, the fact that appellant suffered a broken patella lends further support to Breyona's testimony.

**{¶36}** Given the evidence, we conclude that the jury did not lose its way in finding appellant guilty of felonious assault. Accordingly, appellant's first assignment of error is without merit.

**{¶37}** Appellant's second assignment of error states:

THE TRIAL COURT ERRED IN FINDING APPELLANT BIGSBY GUILTY OF AGGRAVATED ASSAULT [sic.] AS THAT FINDING IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶38}** The jury also convicted appellant of two counts of aggravated burglary. The first count was in violation of R.C. 2911.11(A)(1) and the second count was in violation of R.C. 2911.11(A)(2). These sections provide:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
(2) The offender has a deadly weapon or dangerous ordnance on or

about the offender's person or under the offender's control.

R.C. 2911.11(A)(1)(2).

**{¶39}** As to his aggravated burglary conviction, appellant again asserts the state failed to prove he used a deadly weapon. Additionally, appellant argues the state failed to demonstrate that he had a purpose to commit another offense when he entered Stewart's house. He asserts that the "other offense" element of aggravated burglary could be either felonious assault or domestic violence. He relies on his argument in his first assignment of error that his felonious assault conviction was against the weight of the evidence and, therefore, he argues felonious assault cannot be the "other offense." He argues that domestic violence cannot be the "other offense" because his testimony indicated that he acted in self-defense and the only pictures of blood in the house were in the bedroom, which appellant claims supports his self-defense explanation.

**{¶40}** Because appellant's felonious assault conviction is not against the manifest weight of the evidence, his argument that felonious assault cannot be the "other offense" required for an aggravated burglary conviction necessarily fails. Moreover, it was not necessary for the state to prove that appellant had a purpose to commit another offense when he entered Stewart's house. The Ohio Supreme Court has held that, "[f]or purposes of defining the offense of aggravated burglary pursuant to R.C. 2911.11, a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass." *State v. Fontes*, 87 Ohio St.3d 527, 721 N.E.2d 1037 (2000), syllabus. And as addressed above, a baseball bat can be a deadly weapon and the evidence supported the jury's finding that appellant used the bat to hit Stewart.

**{¶41}** Moreover, while appellant testified that Breyona let him into the house, this testimony was contradicted by both Breyona and Stewart. Breyona testified that she was upstairs when she heard appellant "barging his way in." And Stewart testified that she opened the door and told appellant he was not welcome to come in because she had company and this resulted in appellant pushing the door open and

punching her in the face. Once again, which testimony to believe was a determination for the jury. We cannot conclude that the jurors lost their way in finding Breyona's and Stewart's testimony more credible than appellant's testimony.

{¶42} Accordingly, appellant's second assignment of error is without merit.

{¶43} Appellant's third assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT THE EVIDENCE DEMONSTRATED BY THE STATE WAS SUFFICIENT TO SUPPORT CONVICTIONS FOR FELONIOUS ASSAULT AND AGGRAVATED BURGLARY.

{¶44} In this assignment of error, appellant asserts there was not sufficient evidence to support his convictions. As to his felonious assault conviction, appellant once again asserts that the state failed to present evidence of any incapacity he caused to Stewart. As to his aggravated burglary conviction, he argues the state failed to prove that he used a deadly weapon and failed to prove that he went to Stewart's house with the purpose to commit another criminal offense.

{¶45} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In essence, sufficiency is a test of adequacy. *Thompkins*, 78 Ohio St.3d at 386. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113.

{¶46} In considering the evidence set out above, the state presented sufficient evidence going to each element of felonious assault and aggravated burglary.

{¶47} As discussed in appellant's first assignment of error, Stewart's testimony, along with corroboration by Dr. Gruber, was sufficient to establish the first

count of felonious assault that appellant knowingly caused her "serious physical harm" when he repeatedly punched her in the face and head. Moreover, for the second count of felonious assault the state was only required to prove "physical harm," as opposed to the "serious physical harm" that was required for the first count, which it clearly did by Stewart's testimony. Additionally, for the second count the state had to present evidence that appellant used a deadly weapon in causing the physical harm. Breyona's testimony that she saw appellant hit Stewart with a bat was sufficient evidence on this point.

**{¶48}** And as discussed in appellant's second assignment of error, there was no requirement that appellant form the intent to commit another offense inside Stewart's house before he entered the house in order to find him guilty of aggravated burglary. It was sufficient that he formed the intent to commit felonious assault while he was trespassing in Stewart's house.

**{¶49}** Based on the above, the state presented sufficient evidence to support the jury's verdict in this case. Accordingly, appellant's third assignment of error is without merit.

**{¶50}** Appellant's fourth assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO ALLOW APPELLANT BIGSBY TO CROSS EXAMINE THE VICTIM ON HER DRUG USE AND PSYCHOLOGICAL CONDITIONS.

**{¶51}** Here appellant asserts the trial court should have allowed his counsel to cross examine Stewart regarding her alleged drug use and psychological conditions. He claims he could have used this evidence to impeach Stewart's testimony by calling into question her ability to perceive and remember the details of the incident. Appellant concedes that Stewart's medical records do not specify the exact dates or the extent of her drug use and mental conditions. But he argues his counsel should have been able to question Stewart on cross-examination as they related to her ability to perceive and remember.

{¶52} A trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Mays*, 108 Ohio App.3d 598, 617, 671 N.E.2d 553 (8th Dist.1996). Abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). More specifically, the limitation of cross-examination lies within the trial court's sound discretion viewed in relation to the particular facts of each individual case. *State v. Vinson*, 70 Ohio App.3d 391, 397, 591 N.E.2d 337 (12th Dist.1990), citing *State v. Acre*, 6 Ohio St.3d 140, 451 N.E.2d 802 (1983).

{¶53} While cross-examining Stewart, defense counsel asked her questions about what prescription medications she was taking on the night in question. (Tr. 358). Counsel then asked Stewart if she consumed any alcohol that night, to which she responded "no." (Tr. 358). Counsel then began to ask if she had smoked anything. (Tr. 358). The prosecutor objected and the court sustained the objection. (Tr. 358). Later, during the cross-examination of Dr. Gruber, defense counsel made a motion to proffer Stewart's medical records for our review. (Tr. 543). Counsel stated the proffer was so this court could review the trial court's determination not to allow any discussion about Stewart's history as the parties had discussed previously. (Tr. 543). The previous discussion, however, was not part of the record.

{¶54} The proffered exhibit included copies of Stewart's past medical records. (Tr. 543-544). The records appellant sought to cross-examine Stewart with were from August 2007, four months after the incident at issue, but they included Stewart's medical history. There is nothing in the records that seems to indicate that Stewart has problems recalling events or that she ever abused any drugs or alcohol that would affect her ability to remember. Moreover, there was no evidence presented at trial that at the time appellant attacked her Stewart was under the influence of any memory-impairing substance or alcohol. For these reasons, we cannot conclude that the trial court abused its discretion in disallowing defense counsel to cross-examine Stewart using the proffered medical records.

**{¶55}** Accordingly, appellant's fourth assignment of error is without merit.

**{¶56}** Appellant's fifth assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT BIGSBY'S MOTION FOR A MISTRIAL WHEN A WITNESS REFERENCED APPELLANT BIGSBY'S PRIOR BAD ACTS.

**{¶57}** Appellant contends the trial court should have granted his motion for a mistrial when Stewart mentioned that she had visited him in prison thereby bringing up his prior bad acts. He asserts that once the jury heard he had been in a correctional facility, he was deprived of his right to a fair trial.

**{¶58}** The decision to grant or deny a mistrial rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Crim.R. 33; *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1997). Granting a mistrial is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice. *State v. Jones*, 83 Ohio App.3d 723, 737, 615 N.E.2d 713 (2d Dist.1992). Mistrial is not properly granted, "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Lukens*, 66 Ohio App.3d 794, 809, 586 N.E.2d 1099 (10th Dist.1990).

**{¶59}** In cross-examining Stewart, the following took place:

Q And you said your relationship ended in November of 2006, correct?
A The romantic relationship, yes.
Q Okay. You continued to see each other, did you not?
A I've visited him at a correctional facility.

(Tr. 325-326). It was at this point that appellant moved for a mistrial. (Tr. 326). The court denied the motion. But it admonished the jury that Stewart's last answer was stricken and they were to disregard where Stewart may have seen appellant. (Tr. 327).

**{¶60}** Appellant's counsel immediately objected to Stewart's response. And while the court did not declare a mistrial, it did instruct the jury to disregard Stewart's statement. A jury is presumed to follow the court's curative instructions. *State v. Bereschik*, 116 Ohio App.3d 829, 837, 689 N.E.2d 589 (1996). Thus, it is not unreasonable to presume that the jury followed the court's instructions and disregarded Stewart's statement. The trial court did not abuse its discretion in denying a mistrial.

**{¶61}** Accordingly, appellant's fifth assignment of error is without merit.

**{¶62}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

DeGenaro, P.J., concurs.