[Cite as *State v. Mascarella*, 2017-Ohio-8013.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 15 MA 0102 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| JOSEPH MASCARELLA | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from the Court of Common Pleas of Mahoning County, Ohio
Case No. 13 CR 1130

JUDGMENT:      Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant:      Atty. Desirae DiPiero
7330 Market Street
Youngstown, Ohio 44512

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: September 28, 2017

WAITE, J.

{¶1} Appellant Joseph Mascarella appeals a June 23, 2015 Mahoning County Common Pleas Court decision finding him guilty of nine counts of robbery following jury trial. Appellant argues that an eyewitness' in-court identification was tainted by an unduly suggestive photo array that took place during trial preparation. Appellant also argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. For the reasons that follow, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} Appellant was indicted on fifteen counts of aggravated robbery, a felony of the first degree in violation of R.C. 2911.01(A)(1), (C). Each count carried an attendant R.C. 2941.145(A) gun specification. The charges stemmed from a series of robberies carried out at several businesses: Burger King, Dollar General, Family Dollar, Taco Bell, Subway, and McDonalds.

{¶3} On September 30, 2013, a sole perpetrator carried out a robbery at a Burger King in Youngstown. The robber was dressed in black and wore a red bandana that partially covered his face. At the time of the robbery, there were four employees and several customers in the restaurant. The robber ordered the employees to open the safe and counted backwards from five as a time limit. He took register drawers holding approximately $1,800 out of the safe and put them in a black bag. A patron saw the perpetrator, without his bandana, ride away on a 20"

neon green bicycle. Multiple witnesses described the perpetrator as a light-skinned African American male.

{¶4} The next robbery occurred on October 4, 2013 at a Dollar General in Youngstown. There were two perpetrators, described by witnesses as African American males. The robbers wore dark clothing with bandanas partially covering their faces. At the time of the robbery, one employee was present at the store. Similar to the Burger King robbery, the robbers ordered the employee to open the safe and counted backwards from five as a time limit. Once the safe was opened, the robbers took money from the register and safe and placed it in a duffel bag. They also took the employee's wallet. As the robbers left the store, one of them lost a shoe. DNA testing was later conducted on the shoe, which matched a man named Manny Zarlengo.

{¶5} On October 8, 2013, a robbery occurred at a Family Dollar in Youngstown. Two employees were present in the store. Again, the perpetrators were described as two light-skinned African American males. According to the witnesses, the robbers wore hoodies and covered their faces with masks. A witness saw a gold or tan Malibu near the store around the time of the robbery.

{¶6} On October 12, 2013, a robbery occurred at a Taco Bell in Youngstown. Three employees were present in the store at the time. Witnesses described the robbers as two African American males wearing dark clothing with bandanas partially covering their faces. One of the robbers was taller than the others and witnesses

claimed that he had a gun. The robbers left in a gold Malibu after taking a cash register drawer.

{¶7} A robbery occurred on October 27, 2013 at a Subway in Youngstown. At the time of the robbery, there were two employees and two customers in the store. Again, the robbers were described as two African American males wearing bandanas across their faces. One of the robbers was said to be taller and the other shorter. They attempted to gain access to the safe, however, the owner was unable to open it because of a time delay protection. Each robber carried a gun and, at some point, one of them pulled the trigger, but his gun jammed and did not fire. The robbers took the customers' wallets and the register drawer and put them in a bag.

{¶8} The sixth and final pertinent robbery occurred at a McDonalds on October 18, 2013. This time witnesses saw three perpetrators who covered their faces with bandanas and carried guns. The robbers took the register drawer.

{¶9} During the course of the investigation, JayQuann McMullen and Manny Zarlengo became persons of interest. The police learned that McMullen, Zarlengo and Appellant were staying at a house in Youngstown. Officers were sent to the location and they found a gold Malibu parked in the driveway. Inside the house, officers located Appellant, McMullen, and Zarlengo. Appellant was found hiding underneath the basement stairs. During a search of the house, police found twelve cash register drawers, cash, rolls of change, a duffel bag, bandanas, dark hoodies, several driver's licenses and various cards belonging to victims, a green bicycle, and ammunition.

{¶10} At trial, the state theorized that Appellant, Zarlengo, and McMullen committed the robberies. Before trial, Zarlengo and McMullen entered into plea agreements with the state for their roles in the robberies. The state claimed that Appellant was either one of the masked robbers or the driver of the gold Malibu. The state took the position that Appellant was the sole perpetrator of the Burger King robbery.

{¶11} Both Zarlengo and McMullen testified at trial that Appellant had no involvement in the robberies. Instead, they claimed that a man named Antwon Martinez was the third perpetrator. McMullen and Zarlengo named Martinez as the third perpetrator for the first time during trial. McMullen and Zarlengo both claimed that Martinez told them that he robbed the Burger King. As to the Dollar General robbery, Zarlengo claimed that he and Martinez went in the store while McMullen waited in the car as the getaway driver. McMullen, however, claimed that he and Zarlengo went into the store while Martinez waited in the car. McMullen and Zarlengo testified that Martinez owned the gold Malibu. However, the state introduced testimony that Appellant paid for and used the car. A driver's license, class schedule, and mail belonging to Appellant were found inside the car. The police had interviewed Martinez during the course of their investigation, however, he was shot and killed prior to trial.

{¶12} The state also produced evidence that Martinez did not meet the physical description of any of the robbers. The robbers were described by witnesses as light-skinned African Americans; Martinez was dark skinned. Witnesses said that

the third perpetrator had curly neck-length hair. While Appellant has curly hair, Martinez was recognizable for his dreadlocks or braids.

{¶13} A jury convicted Appellant of the Burger King, Dollar General, and Subway robberies and the accompanying gun specifications. He was acquitted of the Family Dollar, Taco Bell, and McDonald's robberies. In the aggregate, Appellant was sentenced to twenty-three years of incarceration. Appellant timely appeals his convictions.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT OVERRULED APPELLANT'S MOTION FOR A MISTRIAL.

{¶14} The decision as to whether to grant a mistrial rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). The decision to grant a mistrial "is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice." *State v. Bigsby*, 7th Dist. No. 12 MA 74, 2013-Ohio-5641, ¶ 58. As such, a mistrial will not be granted "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *Id*. The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶15} Appellant orally moved for mistrial after a Burger King patron testified about a photo lineup conducted by the prosecutors approximately three to six months

before trial. (5/4/15 Trial Tr., pp. 479-502.) Appellant argued that the photo lineup did not follow the statutory procedures and tainted the witness' in-court identification of Appellant. The trial court denied the motion. The court explained that the witness' identification was "reliable in his mind, and it's a question of the jury determining if they believe that he is accurate or not." *Id.* at p. 500. Appellant's counsel then asked the court to suspend trial to allow him to file a motion to suppress. *Id.* at p. 501. The court denied the request, stating:

> The identification is made in his mind when he sees the defendant, according to his testimony, at the scene. He does nothing with that other than indicate to the prosecution that he is able to make that identification, which he eventually makes at trial, and the photograph with the array is used by the prosecution in their preparation of the defendant to testify. It is not relied upon or offered as the means by which identification is made. Therefore, I don't think a motion to suppress is appropriate.

*Id.* at pp. 501-502.

{¶16} On appeal, Appellant contends that the photo array did not follow the statutory guidelines of R.C. 2933.83, thus was unduly suggestive. He argues that a suggestive photo array is only permissible when an in-court identification is made independently from the photo array. Appellant additionally argues he was never notified that the witness viewed a photo array. He urges that the delayed disclosure of the photo array was prejudicial and did not provide counsel with adequate time to

prepare a cross-examination as to whether the in-court identification was independently made.

{¶17} Contrary to Appellant's assertion, the record demonstrates that defense counsel was aware that the witness viewed the photo array. This is evident from defense counsel's cross-examination of the witness. Counsel asked, "[a]nd when were you shown the lineup of photos, sir? When were you shown a series of photos so that you could pick him out?" *Id.* at pp. 445-446. Because no photo array was mentioned during the direct examination by the state, these questions certainly suggest that defense counsel knew about the photo array. Additionally, during the arguments regarding the mistrial request, the state argued that defense counsel had prior knowledge that the witness identified Appellant as one of the perpetrators. Appellant did not deny this assertion. Appellant's argument that he was unaware of any photo array and that he lacked time to prepare an adequate cross-examination appears to be contrary to the record.

{¶18} The state concedes that the minimum requirements of R.C. 2933.83 were not met, but argues that the remedy is not mistrial or suppression of the evidence. Rather, the state urges that the remedy is cross-examination of the witness. We note that the state did not attempt to enter the result of viewing the photo array into evidence, but used the witness to identify Appellant in court. The question is whether the state's failure to comply with R.C. 2933.83 tainted the witness' in-court identification of Appellant.

**{¶19}** When a witness has been presented with images of the defendant before trial, a trial court employs a two-step approach to determine whether that out-of-court identification has tainted the witness' in-court identification of the defendant. *State v. Russell,* 7th Dist. No. 13 CO 16, 2014-Ohio-2467, ¶ 19, citing *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The court first determines whether the identification procedure was unduly suggestive. *Russell* at ¶ 19. If the procedure was unduly suggestive, then a court must determine whether the later identification was reliable. *Id.* ¶ 20.

**{¶20}** The issue of a photo array first arose during defense counsel's cross-examination of a witness. The witness testified that he informed detectives he could identify the robber a few days after the robbery. *Id.* at pp. 482-484, 487-489. However, the officers did not have a suspect or photographs at that time. The witness was not shown a photo array until about a year later, during preparation for Appellant's trial.

**{¶21}** There is nothing within this record to demonstrate that the photo array was unduly suggestive. The photo array contained six photographs and was the same grouping shown to another witness. At no point at trial or on appeal did Appellant contest the photo array as to the other witness.

**{¶22}** Even if the array was suggestive, the record is devoid of any evidence that the witness' in-court identification was unreliable. "An identification is unreliable if there is a very substantial likelihood of irreparable misidentification." *Id.* at ¶ 20. In

determining whether an identification was reliable, a trial court must consider: the opportunity of the witness to view the perpetrator during the crime, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated by the witness at the presentation, and the length of time between the crime and the presentation. *Id.*

{¶23} In court, the witness gave the following testimony regarding his identification of Appellant:

Q  Did he come out of the store?

A  He came around the corner from the store.

Q  Was it the same one you saw inside the store?

A  Yes.

Q  How did you know that?

A  I'll never forget that.  That's all I can say.  I'll never forget it.

Q  Was he wearing the same thing when you saw him in the store?

A  Yes.

Q  Were you ever able to see more than just his eyes?

A  Yes.

Q  What did you see?

A  What I saw was after he came like around the corner on the bicycle, he did not have the bandana under -- across his face.

Q  Were you able to see his entire face?

A  Yes.

Q  Do you see that same person in the courtroom today?

A  Yes, I do.

Q  Can you point to him and describe what he is wearing?

A  Right there. [Identified Appellant].

(5/4/15 Trial Tr., pp. 438-439.)

{¶24}  Although the photo identification was made approximately a year after the robbery, the witness testified that he told detectives only days after the robbery that he could identify the perpetrator. The witness testified he saw the robber's face after he removed his bandana as he fled the scene. While the jury also heard testimony from another witness that the bandana was still in place as the perpetrator fled, this merely becomes an issue of credibility for the jury to decide. As to the level of certainty, the witness testified that he would never forget the perpetrator.

{¶25}  Importantly, the trial court instructed the jury on identification witnesses:

Some things you may consider in weighing the testimony of an identifying witness. They are, capacity of the witness; that is, the age, intelligence or defective senses, if any, and the opportunity of the

witness to observe; the witness' degree of attention at the time he observed the offender; the accuracy of the witness' prior description or identification, if any; whether the witness had occasion to observe the defendant in the past; the interval of time between the event and the identification; all surrounding circumstances under which witnesses have identified defendant, including deficiencies, if any, in a lineup, photo displays or one on one.

*Id.* at pp. 1051-1052.

**{¶26}** The jury heard the witness testify that he knew the man he saw on the bicycle was the same man who robbed the Burger King. He was unwavering in his testimony that he saw the man's face and that it was Appellant. The jury also heard the discrepancy between this witness' testimony and that of another witness regarding whether that the robber's face was covered as he fled on the bicycle. The jury also heard testimony that the witness was not shown the photo array until a year after the robbery had occurred.

**{¶27}** Regardless, "the remedy for a violation of R.C. 2933.83 is cross-examination at trial, not suppression of the identification." *State v. Gaines,* 2016-Ohio-1312, 62 N.E.3d 708, ¶ 28 (11th Dist.), citing *State v. Ruff,* 1st Dist. No. C-110250, 2012-Ohio-1910. Here, defense counsel did elicit testimony from the witness highlighting certain flaws in the photo array. For instance, on cross-examination the witness testified that he was shown the photo array almost a year after the robbery. Defense also elicited testimony that another witness contradicted

this testimony and testified that the robber wore his bandana as he rode away on his bicycle. Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

APPELLANT'S CONVICTIONS FOR AGGRAVATED ROBBERY WERE BASED UPON INSUFFICIENT EVIDENCE.

**{¶28}** "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, (7th Dist.), ¶ 49, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper,* 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson,* 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci,* 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt,* 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶29}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no

rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶30}** Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1). That section provides:

(A)  No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1)  Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

**{¶31}** Appellant solely contests the sufficiency of the evidence as to the element of identity. "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15. "Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991).

**{¶32}** "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Prieto,* 7th Dist. No. 15 MA 0200, 2016-Ohio-8480, ¶ 34, citing *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *Jenks* at paragraph one of the syllabus. In fact, "evidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith,* 7th Dist. No. 06 BE 22,

2008-Ohio-1670, ¶ 49. For ease of understanding, each robbery for which Appellant was convicted will be addressed separately.

*Burger King Robbery*

**{¶33}** The Burger King robbery was perpetrated by an African American male who wore dark clothing, a baseball hat, and a red bandana across his face. The robber ordered the store manager to open the safe and counted backwards from five as a time limit. The robber took several cash register drawers and money from the safe totaling more than $1,800, which he stuffed in a duffel bag. He fled on a neon green 20-inch bicycle. No DNA or fingerprint evidence was recovered from the crime scene.

**{¶34}** The state presented testimony from four eyewitnesses. The first witness identified Appellant in a pre-trial photo array and in court, as previously discussed. He described the perpetrator as a young, light-skinned African American male. (5/4/2015 Tr., p. 436.) He testified that he saw the perpetrator flee on a 20" neon green bicycle. He claimed that the perpetrator took off his bandana while he was on the bicycle and his face was visible. In court, he identified Appellant as the man on the bicycle.

**{¶35}** A second eyewitness identified Appellant in a photo array conducted one month after the robbery. (5/4/2015 Tr., pp. 759-760.) Although the robber's face was partially covered by a bandana, the witness testified that he was able to identify the physical characteristics of the robber: his facial structure, eyes, eyebrows, and

hair. He testified that the perpetrator had neck-length curly hair that stuck out of a baseball hat.

**{¶36}** A third eyewitness could not identify Appellant, but testified that the robber wore dark clothes with a red bandana partially covering his face. As previously discussed, a fourth eyewitness testified that she saw the perpetrator on the bicycle but his face was covered.

**{¶37}** While McMullen and Zarlengo testified that Martinez was responsible for the Burger King robbery, the evidence produced at trial did not support this claim. Eyewitnesses described a light-skinned African American male with curly, neck-length hair. The state presented testimony that Martinez was dark-skinned, while Appellant is lighter-skinned. Appellant had "[a] little curly fro" while Martinez had recognizable dreadlocks or braids. (5/4/15 Trial Tr., pp. 882, 993.) The state showed the jury a photograph of Martinez. Additionally, the surveillance video of the Burger King robbery was played for the jury and admitted into evidence.

**{¶38}** This record is replete with circumstantial evidence to support the jury's verdict. "Circumstantial evidence and direct evidence inherently possess the same probative value." *Prieto* at ¶ 34. Furthermore, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *Smith* at ¶ 49.

**{¶39}** In viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the state proved Appellant was the perpetrator of the crime. As such, there is sufficient evidence to find Appellant guilty of the Burger King robbery.

*Dollar General Robbery*

{¶40} At the time of the robbery, only one employee was present in the store. The employee testified that two African American males wearing dark clothing and bandanas covering their faces entered the store and put a gun to the side of his head. During a police interview, he specifically described the men as light-skinned African American males. (5/4/15 Tr., p. 505.) He described one of the perpetrators as about six feet tall and the other as shorter. During the robbery, one of the robbers took his wallet. They also took the cash register drawer and money from a safe, which they put in a duffel bag. A second safe could not be opened due to a time delay system.

{¶41} Officers spoke to witnesses who saw the robbers run out of the store and get into a waiting gold or tan Malibu. (5/4/15 Trial Tr., pp. 905-906.) Officers also spoke to a man who lived on the street parallel to the Dollar General. The man told officers that a tan Malibu with several people inside pulled into his driveway, but pulled out and left when they saw him walk outside. Shortly after this occurred, the police received the 911 call regarding the robbery.

{¶42} When police searched the house where Appellant was staying, they found a gold Malibu parked in the driveway. While the car was registered to Martinez, Detective Lambert testified that Martinez and his mother told investigators that Appellant gave Martinez the money to purchase the car and asked him to put the car in his name. Detective Lambert testified that Appellant drove the car, not

Martinez. This was supported by testimony that a driver's license, mail, and a class schedule belonging to Appellant were found in the vehicle. (5/4/15 Tr., p. 717.)

{¶43} The robbers took a register drawer and the employee's wallet from the Dollar General. That wallet and several register drawers were found at the house where Appellant was staying. Officers also found three bandanas and clothing that matched the description of the robbers' clothing. During the search of the house, officers discovered Appellant hiding underneath the basement stairs.

> [I]t is * * * well established that the flight of an accused from justice is admissible as evidence of the consciousness of guilt. "It is to-day [sic] universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Citations and emphasis omitted.)

*State v. Cline*, 11th Dist. No. 2007-T-0052, 2008-Ohio-1500, ¶ 60. At the very least, Appellant's attempt to hide from police falls within related conduct.

{¶44} Although McMullen claimed at trial that Martinez was the third perpetrator, he had previously told investigators that "the guys you arrested, you have the right three guys." *Id.* at pp. 933-934. The three people who had been arrested at that time were Appellant, McMullen, and Zarlengo.

{¶45} The only physical evidence retrieved from the scene was a shoe that Zarlengo lost during the robbery. DNA testing on the shoe revealed a match to Zarlengo, who admitted his role in the robbery. Although there is no physical

evidence linking Appellant to the robbery, as previously stated, circumstantial evidence and direct evidence possess the same probative value. When viewing the evidence in the light most favorable to the state, there is substantial evidence that Appellant was the perpetrator of the Dollar General robbery.

*Subway Robbery*

{¶46} Four eyewitnesses provided testimony as to the Subway robbery. One was able to identify Appellant as the perpetrator in court. Although the witness was never shown a photo array, he felt "strongly" that Appellant was the perpetrator holding the gun. He testified that, "[t]he reason why I say that is because when someone holds a gun to your head, you look into their eyes. I didn't need to see his mouth or his chin. I saw his eyes and his cheekbones and the structure of his face, and I will never forget those eyes, just as with the other individual." (5/4/15 Trial Tr., p. 613.)

{¶47} The remaining witnesses did not identify Appellant, but described the perpetrators as two African American males wearing dark clothing and bandanas that partially covered their faces. According to witnesses, one of the men was tall and the other short. The robbers ordered the storeowner to open the safe. The storeowner informed the perpetrators that he could not open the safe because of a time delay. One of the men pointed his gun at the ceiling and pulled the trigger, however, the gun jammed and did not fire. The men took the register drawer, a customer's wallet, and removed cash from a second customer's wallet. A surveillance video from the robbery was played for the jury.

**{¶48}** The evidence as to the identity of the perpetrators in the Subway robbery is similar to the other incidents. One eyewitness identified Appellant in court. Although the other eyewitnesses were not able to identify Appellant, they described the robbers as two African American males wearing red bandanas that partially covered their faces.

**{¶49}** Similar to the Dollar General robbery, the perpetrators took the cash register drawers and a wallet. A wallet and several cash register drawers were recovered from the house where Appellant was found. The wallet recovered from the house contained the victim's social security card, driver's license, and family photographs.

**{¶50}** In viewing the evidence in a light most favorable to the prosecution, reasonable jurors could find Appellant guilty of this robbery, also. Appellant's second assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 3</u>

APPELLANT'S CONVICTIONS FOR AGGRAVATED ROBBERY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶51}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence

and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶52}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶53} Appellant's manifest weight arguments are also based on the identity element of the offenses. He contends there is no credible evidence linking him to the robberies. In each robbery, there are two competing theories: the state's theory that Appellant was one of the perpetrators and the defense's theory that Martinez was one of the perpetrators.

*Burger King Robbery*

{¶54} In support of the state's theory, three eyewitnesses testified. As previously discussed, a Burger King customer told investigators that he could immediately identify the perpetrator, however, the police did not have a suspect or photographs at that time. At trial, the customer identified Appellant as the perpetrator. On cross-examination, the defense elicited testimony that the customer picked Appellant's photograph out of a photo array approximately one year after the incident. The defense also pointed out an inconsistency between the customer's testimony and that of another witness regarding whether the robber wore his bandana while he rode away on his bicycle.

{¶55} A Burger King employee also testified. This witness originally identified Appellant as the perpetrator during a photo array one month after the robbery. He testified that the perpetrator had neck-length curly hair that stuck out of a baseball hat. While the perpetrator's face was partially covered by a bandana, the witness testified that during his time in food service he had learned to focus on different facial characteristics.

{¶56} As to the defense's theory, McMullen and Zarlengo testified that Martinez was the perpetrator, not Appellant. Zarlengo testified that he and Appellant were close and were best friends at the time of the robberies. Zarlengo also testified that he, Appellant, and McMullen were known to spend a great deal of time together. McMullen also testified he was a close friend of Appellant. McMullen testified that the house where they were arrested was his, and that Appellant and McMullen often stayed there. Zarlengo and McMullen asserted that Martinez was involved for the first time at trial, and that Martinez had been shot and killed sometime between the robberies and commencement of trial.

{¶57} Importantly, two eyewitnesses identified Appellant as one of the robbers. While the customer identified Appellant for the first time during trial preparation a year after the robbery occurred, and there was some discrepancy between the witnesses as to whether Appellant's face was covered while he fled, there is nothing within this record to show that this testimony was unbelievable. There were also discrepancies in McMullen and Zarlengo's testimony. Evidence was presented to show the friendship between Appellant, McMullen, and Zarlengo. Testimony was admitted showing that Martinez had died before trial, thus could not refute the allegations against him. Additionally, testimony established that Appellant is light-skinned and Martinez was dark. Zarlengo's description of Appellant's "little curly fro" match the witnesses' description of the perpetrator's curly, neck-length hair. Martinez had braids or dreadlocks. The jury was also able to observe Appellant's

physical characteristics and also Martinez's, as a photograph of Martinez was admitted into evidence.

{¶58} Considering all the above, it cannot be concluded the Burger King robbery conviction was against the manifest weight of the evidence. Although we may consider the credibility of witnesses in a review of manifest weight, great deference is given to the trier of facts' determination. When there are two fairly reasonable views of the evidence, we will not choose which one is more credible.

*Dollar General Robbery*

{¶59} As previously discussed, a witness described the robbers as two light-skinned African American males wearing bandanas that partially covered their faces. Another witness told investigating officers a third person waited in a getaway car. One of the robbers was described by witnesses as around six feet tall and the other was shorter. Both Appellant and Martinez were around six feet tall. McMullen and Zarlengo are approximately 5'6" tall.

{¶60} While McMullen and Zarlengo testified that Martinez was the third perpetrator, he did not match the physical description given by the witnesses or the still frame photographs from the robbery. Again, Appellant is light and Martinez is dark and they had very different hairstyles. The surveillance video of the robbery was played for the jury, giving them an opportunity to see the perpetrator's physical characteristics. A photograph of Martinez was admitted into evidence which allowed the jury to compare the physical characteristics of the perpetrators to Appellant,

Martinez, McMullen, and Zarlengo. Detective Lambert testified that Martinez "clearly was not any of the people that we had photographs of." (5/4/15 Trial Tr., p. 876.)

**{¶61}** There was also a discrepancy between McMullen's and Zarlengo's testimony. McMullen testified that he and Zarlengo were inside the store while Martinez served as the getaway driver. However, Zarlengo testified that he and Martinez were inside the store and McMullen was the getaway driver. Additionally, the testimony of neither comport with the witness' descriptions and the surveillance video.

**{¶62}** The robbers took money from the safe, cash register and an employee's wallet, which were stuffed into a duffel bag. The wallet and cash register drawers were found at the house where Appellant was staying. *Id.* at pp. 305, 532, 709. Appellant was found hiding underneath the basement stairs when the officers searched the house.

**{¶63}** A man who was near the Dollar General told police that he saw two men run from the store and get into a tan Malibu that had been waiting. A gold Malibu was also parked in the driveway of the house where Appellant was staying. As previously discussed, there is evidence that Appellant drove the Malibu.

**{¶64}** Importantly, the surveillance video of the Dollar General robbery was played for the jury. Additionally, a picture of Martinez was admitted into evidence, Appellant was present at trial and McMullen and Zarlengo testified. The jury was able to observe the physical characteristics of the all the men suspected of the crime, including their height, facial characteristics, and skin coloring.

**{¶65}** As is the case with the other robberies, the identity of the third perpetrator is largely based on circumstantial evidence and witness credibility. "Evidence supporting the verdict may be found solely through circumstantial evidence." *Smith, supra,* at ¶ 49. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co., supra,* at 80. The jury was in the best position to determine the witness' credibility. We defer to their judgment.

*Subway Robbery*

**{¶66}** Similar to the Burger King robbery, an eyewitness identified Appellant as the third perpetrator of the Subway robbery. Two witnesses provided testimony, however, only one could positively identify Appellant. This witness was never shown a photo array but identified Appellant at trial. The witness testified:

> I feel strongly that the gentlemen sitting there was the gentleman that held the gun to my head. The reason why I say that is because when someone holds a gun to you head, you look into their eyes. I didn't need to see his mouth or his chin. I saw his eyes and his cheekbones and the structure of his face, and I will never forget those eyes, just as with the other individual.

(5/4/15 Trial Tr., p. 613.)

**{¶67}** Another witness testified that he saw two perpetrators, one he described as taller and the other as shorter. *Id.* at pp. 580-581. The witness testified that one of the men took his wallet. The state produced a wallet recovered from the

house where Appellant had been staying and the witness confirmed that it was his. The wallet contained the witness' social security card, driver's license, and family photographs. *Id.* at pp. 585-586.

**{¶68}** As to the defense's version, McMullen and Zarlengo testified that they committed the Subway robbery while Martinez waited in the car. *Id.* at pp. 837, 974. McMullen testified during his juvenile proceedings that he is about 5'6" or 5'7". Zarlengo testified that he is about 5'6". As the witness said one of the perpetrators was taller, McMullen and Zarlengo's testimony that they were both inside does not comport with the witness testimony.

**{¶69}** Considering the evidence, it cannot be concluded that the Subway robbery convictions are against the manifest weight of the evidence.

**{¶70}** The jury was presented with two different theories as to the identity of the third perpetrator in these robberies. The state claimed that it was Appellant while the defense claimed that it was Martinez. The state presented several witnesses who either identified Appellant or provided a description that matched Appellant's physical characteristics. The defense presented testimony from McMullen and Zarlengo who claimed that Martinez, who is deceased, was the third perpetrator. Based on the record, we cannot conclude that the jury's verdict is against the manifest weight of the evidence. Accordingly, Appellant's third assignment of error is without merit and is overruled.

## Conclusion

**{¶71}** Appellant argues that a photo array conducted during trial preparation was unduly suggestive and tainted an eyewitness' in-court identification of Appellant. However, there was nothing suggestive about the photo array and the defense had an opportunity to cross-examine the witness. Appellant also contends that his convictions are not supported by sufficient evidence and are contrary to the manifest weight of the evidence. Again, there is nothing within this record to support Appellant's arguments. Accordingly, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs.