[Cite as *State v. Garner*, 2020-Ohio-4234.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-10 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-122 |
| | : | |
| STEPHEN A. GARNER, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of August, 2020.

. . . . . . . . . . .

JAMES D. BENNETT, Atty. Reg. No. 0022729, Darke County Prosecutor's Office, 504
South Broadway, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee

RICHARD L. KAPLAN, Atty. Reg. No. 0029406, P.O. Box 751192, Dayton, Ohio 45475
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Stephen A. Garner, Jr. appeals his convictions for felonious assault, assault, and vandalism. He contends that the convictions must be reversed because the State did not present sufficient evidence to support them. He further contends the convictions were against the manifest weight of the evidence. We disagree with both contentions, so we affirm.

## I. Factual and Procedural Background

{¶ 2} On May 25, 2018, Garner was indicted on 19 counts related to contaminating the Darke County Jail with methamphetamine: three counts of felonious assault,[1] twelve counts of assault,[2] and one count each of tampering with evidence,[3] illegal conveyance of weapons or prohibited items onto grounds of specified governmental facility,[4] aggravated possession of drugs,[5] and vandalism (cost of damages $7,500 to $150,000).[6] Garner pleaded guilty to tampering, illegal conveyance, and possession. The remaining charges were tried to a jury, which was presented with evidence showing the following facts.

---

[1] Counts 1 and 2 charged violations of R.C. 2903.11(A)(1), first-degree felonies; Count 3 charged a violation of R.C. 2903.11(A)(1), a second-degree felony.

[2] Counts 4, 5, 6, 7, and 8 charged violations of R.C. 2903.13(B) as fourth-degree felonies; Counts 9, 10, 11, 12, 13, 14, and 15 charged violations of R.C. 2903.13(B) as fifth-degree felonies.

[3] Count 16 charged a violation of R.C. 2921.12(A)(1), a third-degree felony.

[4] Count 17 charged a violation of R.C. 2921.36(A)(2), a third-degree felony.

[5] Count 18 charged a violation of R.C. 2925.11(A), a third-degree felony.

[6] Count 19 charged a violation of R.C. 2909.05(B)(2), a fourth-degree felony because the cost of the damage was alleged to be $7,500 to $150,000.

{¶ 3} Around 12:30 p.m. on April 17, 2018, Garner was brought to the Darke County Jail. (The reason is not in the record and is not relevant.) As he entered, Garner said that he had no drugs or other contraband on him, and he was taken to the inmate processing room by Deputy Sheriff Christine Buchert. After processing him, Buchert asked Corrections Officer Jose Anglero to take Garner to the adjoining locker room and have him change into a jail uniform.

{¶ 4} While Anglero watched, Garner took off his street pants and pulled on jail pants. As he did so, Officer Anglero saw something fall to the floor from Garner's rectal area. Garner dropped the jail shirt on the floor, and retrieving it, he also picked up the objects—several small baggies. Anglero immediately radioed for assistance. Deputy Buchert entered the locker room, and Anglero told her that Garner had drugs in his hand. Buchert ordered Garner to drop the drugs, but he refused, stuffing the baggies in his mouth instead. Buchert ordered him to spit them out. Captain Ted Bruner then entered the locker room. Garner eventually spit the baggies into his hand, and Bruner ordered him to drop the baggies and slide them over to him. Garner asked Bruner "if this is going to be a felony," and Bruner said that he did not know. Garner then "flipped through" the four or five baggies in his hand and turned around, resting his elbows on a file cabinet with his hands clasped together, like he was contemplating what to do. After a few seconds, Garner turned back toward the officers and moved his hand toward Captain Bruner, as if to hand him the baggies. Suddenly, Garner brought up his other hand, ripped the baggies open, and threw the open baggies down in Bruner's direction. The baggies and some of their powdery contents hit Captain Bruner's hand. After subduing Garner, Deputy Buchert and Officer Anglero brought him to holding cell number two. Buchert

asked Garner what the substance was, and he replied that it was just salt. When Anglero asked him what it was, Garner retorted: "You'll find out." (Tr. 261). Captain Bruner ordered Deputy Buchert to photograph the scene, while he contacted a drug-unit detective. Bruner then ordered everyone to resume their duties.

{¶ 5} Not long after, the three officers involved began feeling unwell. Deputy Buchert was doing her jail check when she felt lightheaded and dizzy and felt some tingling and numbness. Her heart was racing, and she felt nauseated. Collapsing against a wall, Buchert felt that her life was in danger and called for help. Corporal Tim Nichols found her and helped her to the medical office, where Buchert vomited. When the drug-unit detective arrived, Captain Bruner went to the medical office. He too had begun to feel unwell. He had a headache and felt that his blood pressure had increased. He also felt a tingling sensation throughout his body, heat radiating from his chest, and an overall general weakness come over him. Around the same time, Officer Anglero too began suffering elevated blood pressure, nausea, and lightheadedness. None of the three officers could continue working. An ambulance was called, and all three were transported to the local hospital.

{¶ 6} When the officers arrived at the hospital, they were treated for possible drug exposure. Each officer was decontaminated and given a urine test for methamphetamine. The tests came back negative. After a couple of hours, the officers' symptoms began to subside, and they were released to go home. By the next day, all three had recovered. But later that day, Captain Bruner experienced the same symptoms as he had the day before and returned to the hospital for treatment.

{¶ 7} Corporal Nichols was never in the locker room, but not long after helping Deputy Buchert to the medical office, Nichols too began feel his blood pressure increase and a tingling in his face and mouth. He also had a headache. Nichols felt unable to work, and another deputy drove him to the hospital for treatment. After a couple of hours, he was released to go home. Although Nichols was not scheduled to work the next day, he was called in because other officers at the jail were unwell and were seeking treatment at the hospital. At some point during the day, Nichols, like Bruner, began experiencing the same symptoms as he had the day before—elevated blood pressure, headache, and tingling sensations -- so he returned to the hospital for treatment and then went home.

{¶ 8} Two witnesses from the hospital testified. The hospital's lab director, Matt Kiehl, testified about the methamphetamine test. He explained that the methamphetamine test returns a positive result only when the level of methamphetamine in the urine reaches a certain threshold, so a negative result did not necessarily mean that the drug was not present. The emergency-room physician who treated the officers also testified. Dr. Robert Girman testified that the officers were brought in for possible drug exposure. Based on their symptoms, it was his opinion that the officers had been exposed to methamphetamine or another stimulant. He explained that symptoms develop within minutes of inhaling such a drug and that exposure could incapacitate a person such that the person would be unable to work. Dr. Girman agreed with the lab director that a negative urine test did not mean no exposure. Dr. Girman said a urine test is helpful only if it is positive. He noted that the officers' symptoms had the "[p]otential to be serious." (Tr. 327).

{¶ 9} The day after Garner threw the open baggies of meth, several corrections officers (Corporal Nichols and Captain Bruner among them) began experiencing symptoms of methamphetamine exposure and were taken to the hospital. No inmate experienced symptoms. Testing showed that the substance in the baggies was in fact methamphetamine. The decision was made to shut down the entire jail for decontamination. A bio-hazard cleanup company and various other contractors were hired to decontaminate and clean the jail. They swabbed various areas of the jail, and the test results showed methamphetamine in the booking area, the locker room, and holding cell number two. The air handler that served the administrative and processing area of the jail was also decontaminated; parts of it were cleaned, but the duct work could not be cleaned and was replaced. The jail was shut down for around 24 days. The Darke County Auditor, Carol Ginn, testified that the total cost of the decontamination was $123,181.50. The State presented two exhibits showing that $50,100.00 was spent to house the inmates elsewhere and $73,081.50 was paid to vendors. Ginn testified that a "good chunk" of the amount was reimbursed to the county by the State of Ohio.

{¶ 10} After hearing the evidence, the jury found Garner guilty on the three charges of felonious assault and on one assault charge, the one involving Corporal Nichols. The jury also found Garner guilty of vandalism but found that the State had not proven the alleged cost of damages ($7,500 to $150,000), making the offense a felony of the fifth degree rather than one of the fourth degree. As for the other assault charges, the jury found Garner not guilty on seven of the charges, the State dismissed two, and no verdict was rendered on two, because they were submitted as alternatives to two felonious-assault charges. The trial court sentenced Garner to a total of six years in prison.

{¶ 11} Garner appeals.

## II. Analysis

{¶ 12} Garner assigns two errors to the trial court that challenge the sufficiency and manifest weight of the evidence for his convictions of felonious assault, assault, and vandalism:

THE JURY VERDICT RESULTING IN THREE FELONIOUS ASSAULT CONVICTIONS, ONE ASSAULT CONVICTION AND A VANDALISM CONVICTION [WAS} NOT SUPPORTED BY SUFFICENT EVIDENCE.

THE JURY VERDICT RESULTING IN THREE FELONIOUS ASSAULT CONVICTIONS, ONE ASSAULT CONVICTION AND A VANDALISM CONVICTION [WAS] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 13} Our review of these two evidentiary challenges differs. In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "Where reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder. Rather, upon appellate review, the evidence must be viewed in the light most favorable to the prosecution." *Id.* at 279.

{¶ 14} A different test is used in reviewing a claim that a jury verdict is against the manifest weight of the evidence. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

A. *The felonious-assault convictions*

{¶ 15} Garner's convictions for felonious assault were for violating R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." Garner challenges the evidence that the harm he caused the three officers constituted "serious physical harm" and the evidence that he caused the harm "knowingly."

{¶ 16} There is no dispute that Garner caused the officers physical harm. *See* R.C. 2901.01(A)(3) (pertinently defining "physical harm to persons" as "any injury, illness, or other physiological impairment"). The question is whether the harm was "serious." "Serious physical harm to persons" is statutorily defined and has several meanings. *See* R.C. 2901.01(A)(5). The relevant one here is physical harm "that involves some temporary, substantial incapacity." R.C. 2901.01(A)(5)(c).

{¶ 17} The felonious assault victims were Deputy Buchert, Captain Bruner, and Officer Anglero. Deputy Buchert testified that she felt nauseated, dizzy, and light-headed

and noticed tingling and numbness. She collapsed against a wall and had to be helped to the jail's medical office. She was unable to continue working and sought emergency medical treatment at the hospital. Captain Bruner testified that he developed a headache, noticed a tingling sensation, had elevated blood pressure, and felt heat radiating from his chest. He too was unable to work and sought emergency medical treatment at the hospital. As for Officer Anglero, he testified that he felt lightheaded and nauseated and had elevated blood pressure. Like Buchert and Bruner, he was unable to work and sought emergency medical treatment at the hospital. Dr. Girman, the emergency room physician who examined the officers, testified that each of them had suffered methamphetamine exposure.

{¶ 18} " 'The degree of harm that rises to the level of "serious" physical harm is not an exact science, particularly when the definition includes such terms as "substantial," [and] "temporary[.]" ' " *State v. Bootes*, 2d Dist. Montgomery No. 23712, 2011-Ohio-874, ¶ 19, quoting *State v. Irwin,* 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996. " 'Serious physical harm may be shown by testimony of medical treatment.' " *State v. Morgan*, 2d Dist. Clark No. 2018-CA-103, 2019-Ohio-3691, ¶ 55, quoting *State v. Huckabee*, 8th Dist. Cuyahoga No. 67588, 1995 WL 628374, *4 (Oct. 26, 1995). The note on the definition of "serious physical harm" gives as an example, "an injury or illness requiring more or less prolonged hospitalization or bed rest which temporarily interferes with the victim's ability to work." 1973 Legislative Service Commission Note, R.C. 2901.01.

{¶ 19} After viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found that the physical harm caused by Garner was

"serious." The evidence showed that Garner threw open baggies of methamphetamine in the direction of the three officers and that all three officers suffered injury, illness, or other physiological impairment. All three officers went to the hospital for treatment and decontamination, and the medical testimony showed that they were treated for exposure to meth. We conclude that the officers' physical harm temporarily and substantially incapacitated them by rendering them unable to work. *See In re Reed*, 147 Ohio App.3d 182, 2002-Ohio-43, 769 N.E.2d 412, ¶ 37-38 (8th Dist.) (concluding that evidence that the victim was dizzy and fell while walking could fit the "temporary, substantial incapacity" definition of "serious physical harm to persons," where the defendant dropped the victim on her head and the victim did not seek medical treatment).

{¶ 20} In regard to Garner's culpable mental state, a felonious assault conviction under R.C. 2903.11(A)(1) requires evidence that the offense is committed with knowledge. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 21} At the time of the offense, Officers Buchert, Bruner, and Anglero were standing in front of Garner trying to get him to hand over the baggies. Garner moved like he was going to hand them to Bruner. Instead, Garner quickly ripped open the baggies and threw them in the officers' direction, hitting Bruner's hand before spilling the powdery contents on the floor. Later, when Anglero asked him what it was, Garner retorted, "You'll find out." (Tr. 261.)

{¶ 22} It was reasonable to infer that Garner was aware that throwing open baggies of a powdery drug like methamphetamine would probably seriously harm the

officers. Indeed, it would appear from the evidence that that was precisely Garner's intent. *See Reed*, 147 Ohio App.3d 182, 2002-Ohio-43, 769 N.E.2d 412, at ¶ 39 (After dropping the victim on her head, the defendant said that he was just fooling around, that he had executed a move that he had frequently seen wrestlers on television do. The appellate court found that, though there was no direct evidence that the defendant considered the move dangerous, an intent to harm could be inferred from his actions, and the factfinder could have reasonably concluded that the defendant could have foreseen some harm would result from dropping the victim on her head.). Garner's "you'll find out" statement, though non-specific, could be interpreted to mean that he knew he was exposing the officers to meth and knew it would have consequences. We conclude that the evidence was sufficient for the trier of fact to conclude that Garner acted with knowledge.

{¶ 23}  As to Garner's manifest-weight challenge, the jury instructions on "serious physical harm" and "knowingly" correctly track the relevant statutory language.    This is not an    " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. We conclude that the jury neither lost its way nor created a miscarriage of justice in finding Garner guilty on the three counts of felonious assault.

### B. *The assault conviction*

{¶ 24} Garner was convicted of assaulting Corporal Nichols under R.C. 2903.13(B), which provides that "[n]o person shall recklessly cause serious physical harm to another." Like his challenges to the felonious assault convictions, Garner challenges whether the harm he caused was serious and whether he acted with the culpable mental state, which for assault is "recklessly."

{¶ 25} Although Corporal Nichols was not in the locker room when Garner threw the open baggies, Nichols was in the attached processing room, where traces of meth were found.   Later, after helping Deputy Buchert when she collapsed, Nichols developed a headache, felt tingling in his face and mouth, and experienced elevated blood pressure. He sought treatment at the hospital.

{¶ 26} Based on our earlier serious-harm analysis, and viewing the evidence in a light most favorable to the prosecution, we think that a rational trier of fact could have reasonably found that Corporal Nichols too suffered "serious physical harm." Like the three other officers, he suffered injury, illness, or other physiological impairment, was unable to continue working, and sought treatment at the hospital for symptoms of methamphetamine exposure, which was sufficient to find that the harm involved a "temporary, substantial incapacity."

{¶ 27} The culpable mental state for assault is recklessness. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "Risk" is pertinently defined as "a significant possibility, as contrasted with a remote possibility, that a certain result may occur." R.C. 2901.01(A)(7).

{¶ 28} Potentially, any officer in the jail could have been indirectly exposed to the methamphetamine that Garner threw. The powdery nature of the drug allowed it to get into the air easily and land on any of the three officers' clothing, which appears to be what happened here. It could reasonably be inferred that, when Garner threw the open baggies, some of the drug got on Deputy Buchert. This created a significant possibility

that another officer who came in contact with her would be exposed. Corporal Nichols helped Buchert to the medical office and likely inhaled the meth that was on her clothing. We think that a rational juror could have found that, by throwing open baggies of methamphetamine, Garner acted with heedless indifference to the consequences and disregarded a significant possibility that another officer, like Corporal Nichols, would be seriously harmed.

{¶ 29} As to the manifest weight of the evidence, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost its way nor created a miscarriage of justice in finding Garner guilty of assault.

C. *The vandalism conviction*

{¶ 30} Garner was convicted of vandalism for violating R.C. 2909.05(B)(2), which provides that "[n]o person shall knowingly cause serious physical harm to property that is owned, leased, or controlled by a governmental entity." The definition of "serious physical harm" in the vandalism statute is "physical harm to property that results in loss to the value of the property of one thousand dollars or more." R.C. 2909.05(F)(2). Garner says that the State presented evidence of the cost of the cleanup but failed to present evidence of loss to the value of the jail.

{¶ 31} The cost to restore property is evidence of loss to the value of the property, and R.C. 2909.11(B) provides that "damages can be measured by the reasonable costs of restoring the property." *State v. Baker*, 2016-Ohio-315, 58 N.E.3d 498, ¶ 20 (2d Dist.). R.C. 2909.11(A) provides that a jury need only find that the amount of damage was greater than $1,000, as required by R.C. 2909.05. Here, the testimony of the county

auditor as to the cost to decontaminate and clean the jail constituted sufficient evidence from which a reasonable jury could have found, beyond a reasonable doubt, that Garner caused damage in excess of $1,000, which was sufficient to convict him of vandalism. *See State v. Jonas*, 4th Dist. Athens No. 99CA38, 2001 WL 803825, *8 (Mar. 6, 2001) (concluding that cleanup costs should be included for purposes of determining serious physical harm, where defendant jail inmate had spread excrement in his cell and jail hallway, and that the county had to restore property to its original condition by cleaning and sanitizing because the failure to do so would result in loss of value to the property); *Baker* at ¶ 25 (the evidence of loss to property included "the indiscriminate splashing of blue paint throughout the premises").

{¶ 32} As to Garner's manifest-weight challenge, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. We conclude that the jury neither lost its way nor created a miscarriage of justice in finding Garner guilty of vandalism.

### III. Conclusion

{¶ 33} The first and second assignments of error are overruled. The trial court's judgment is affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., concurs in part and dissents in part:

{¶ 34} To sustain a conviction for felonious assault, the defendant must have knowingly caused "serious physical harm to persons," which in this case meant physical

harm "that involve[d] some temporary, substantial incapacity." R.C. 2901.01(A)(5)(c). As the majority opinion recognizes, the degree of harm required "is not an exact science." *Irwin*, 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996, at ¶ 37.

{¶ 35} I agree that Deputy Buchert sustained "serious physical harm." She became nauseated, experienced dizziness, vomited, collapsed, had to be helped to the jail's medical office, and was taken to the hospital.

{¶ 36} On the other hand, Captain Bruner and Corporal Nichols experienced a tingling sensation, headache, and "increased blood pressure." Bruner indicated that he also experienced heat radiating from his chest and general weakness. Deputy Anglero experienced "elevated blood pressure," nausea, and lightheadedness. (The record does not show the symptomology that, to the officers, indicated their blood pressure became elevated or the degree of elevation.) The officers went to the hospital for examination, and they were treated for exposure to methamphetamine. Their symptoms subsided after a couple hours, and they were released from the hospital. Bruner and Nichols experienced similar symptoms the next day; they returned to the hospital for treatment and then went home.

{¶ 37} While this may be a matter of small degrees, I would conclude that the symptoms experienced by Bruner, Nichols, and Anglero did not rise to the level of serious physical harm, unlike Buchert, who collapsed and needed assistance to the jail's medical office. This does not minimize the harm caused to them, but more so acknowledges the harm sustained by Buchert. The difference recognized by the statutes between causing "serious physical harm" (a felony of the first or second degree) and "physical harm" (a

fourth-degree felony if on an officer, but otherwise a misdemeanor) must be more than a temporary inability to continue working.

{¶ 38} The record proves that Garner acted both recklessly and knowingly.

{¶ 39} I would sustain the felonious assault charge involving Deputy Buchert, but would reverse the felonious assault convictions involving Captain Bruner and Deputy Anglero and the assault conviction involving Corporal Nichols. Although this would have no practical effect on his aggregate sentence, I would remand those counts.


Copies sent to:

James D. Bennett
Richard L. Kaplan
Hon. Jonathan P. Hein