[Cite as *In re D.C.*, 2022-Ohio-4086.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE D.C., JR.

A Minor Child

:
:
:
:

No. 111418

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 17, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-21-109034

---

### *Appearances:*

Patrick S. Lavelle, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Jordan Mason, Assistant Prosecuting
Attorney, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} Appellant D.C., Jr. ("D.C.") appeals the juvenile court's order adjudicating him delinquent of felonious assault and placing him on six months of community-control sanctions with probation supervision. After reviewing the facts of the case and the pertinent law, we reverse and remand to the trial court for further proceedings consistent with this opinion.

**A. Procedural History**

{¶ 2} In a complaint filed on October 12, 2021, the state of Ohio alleged that D.C. was a delinquent child because "on or about September 26, 2021 * * * [he] did knowingly cause serious physical harm to [N.C.] * * *."

{¶ 3} The juvenile court held an adjudication hearing on February 24, 2022. Following the hearing, the juvenile court adjudicated D.C. delinquent of felonious assault, a violation of R.C. 2903.11(A)(1), which is a felony of the second degree if committed by an adult.

{¶ 4} At the March 23, 2022 dispositional hearing, the juvenile court placed D.C. "on community control with probation supervision for a period of six (6) months." It is from this order that D.C. appeals, raising one assignment of error.

**B. Adjudication Hearing Testimony**

{¶ 5} At the adjudication hearing, the state presented testimony from T.G., the alleged victim's mother, and N.C., the alleged child victim. D.C. testified on his own behalf.

**1. T.G.**

{¶ 6} On September 26, 2021, T.G.'s son, N.C., spent the night at his father's house with his cousins, D.C. and C.C. T.G. identified D.C. in court.

{¶ 7} T.G. recalled that when she picked N.C. up the next morning, N.C.'s "father had been in there trying to get him up for probably 10 minutes" before eventually bringing him outside. When N.C.'s father brought N.C. outside, "[N.C.] was very lethargic and disoriented" and "couldn't really even walk down the stairs."

T.G. claimed that this was unusual of N.C. when he woke up and that "[h]e just wasn't himself."

{¶ 8} When N.C. got into T.G.'s car, T.G. "noticed the side of his head was swollen and he had throw up all over his clothes * * *." T.G. inspected N.C.'s head and noticed "a fist print" on one side of his head, and on "the other side of his face * * * his eye was black ** *." T.G. indicated that she did not notice any vomit smell when she picked N.C. up because "when throw up drys [sic] up, it was rubbed into your clothes and only a small amount has gotten into it, it's hard to pick up the smell * * *."

{¶ 9} T.G. took N.C. to the hospital because she knew from working as a "State-Tested Nurse's Assistant" ("STNA") that a reaction "to a concussion was * * * vomiting." Further, because it was "obvious that [N.C.] was hit in his head" and "was disoriented * * * [she] knew that it was a possibility that he could have a concussion * * *."

{¶ 10} At the hospital, N.C. was diagnosed. T.G. responded, "Yes" when asked, given T.G.'s "role and training as an STNA, was the diagnosis consistent with what you believed it to be?" T.G. admitted that she is not licensed to make a medical diagnosis.

{¶ 11} Asked how N.C. acted in the days following the incident, T.G. responded, "He was just very depressed."

## 2. N.C.

{¶ 12} N.C. testified that he was born January 17, 2014. At the time of the February 24, 2022 adjudication hearing, N.C. was eight years old.

{¶ 13} N.C. nodded his head yes when he was asked if something happened to him the last time he was with his cousins. N.C. stated that he "got hurt." N.C. pointed to his arm and head when asked what part of his body got hurt. Asked who hurt him, N.C. pointed to D.C., who he identified as his cousin.

{¶ 14} N.C. recalled that on the night he was at his father's house, his father was at work, his uncles were not there, and his cousins were "playing a few games" on the Xbox.

{¶ 15} N.C. recalled that he was in the living room when he was hit. N.C. stated that he was hit on the side of his head with a boxing glove but was also hit elsewhere, with the court noting that N.C. pointed to his torso when asked where else he was hit. N.C. said that he was also hit with a broomstick, but that it was "a soft hit."

{¶ 16} N.C. testified that his cousin C.C. put boxing gloves on that day and the two of them "were play-fighting with them or just really fighting." According to N.C., play-fighting is "like [they] fight, but [they] don't really hit each other that hard." However, "[s]ometimes it can be hard." N.C. was asked, "when [D.C.] hit you in the head with the boxing gloves hard, was that play-fight?" The court stated for the record that N.C. shook his head "no" in response.

{¶ 17} At some point after being hit, N.C. went into the kitchen and "was gonna take [a] knife" because he "was acting like [he] was very tortured." N.C. explained that tortured "means you're getting hurt endlessly." N.C. clarified that he was going to grab "[a] butter knife because [he] know[s] that's weak." N.C. explained why he was going to get the knife: "I was so frustrated I almost felt like putting it right through his chest." However, after pointing the knife at his cousins, N.C. "put the knife back because [D.C.] grabbed a chair and [he] knew [D.C.] was going to throw it at [him] and that's how [he would] die."

{¶ 18} After being hit, N.C. went into to his father's room, felt dizzy, and threw up before he "decided to go to bed."

{¶ 19} N.C. recalled that when his mother picked him up the next day, he "felt depressed" because of what had happened to him. He stated that his mother took him to the hospital because he felt hurt. N.C. felt better after going to the hospital.

{¶ 20} On cross-examination N.C. was asked, "remember when you said that you didn't feel well that next day. Is that because you stayed up late or was that because of some other reason?" N.C. answered it was for another reason and responded "[y]es" when asked if the reason was "because [he] got hurt." N.C. stated, "now I have head problems."

### 3. D.C.

{¶ 21} D.C. testified that on September 26, 2021, he stayed the night at his grandmother's house with his brother C.C. and his cousin N.C. D.C. testified that he weighs 130 pounds and N.C. weighs "like 115-120" pounds.

{¶ 22} According to D.C., two of his uncles and his uncle's girlfriend also live at his grandmother's house. That evening, the only adult home was his uncle's girlfriend; however, "[s]he was in the attic. She was pregnant so she would never really come down."

{¶ 23} That evening, D.C. was in the living room "watching TV on the Xbox" when he heard C.C. and N.C. talking. Subsequently, N.C. "smacked [D.C.] in [his] neck. Then he sat back down. [D.C.] didn't do anything." D.C. recalled that he was smacked four or five times. In response, D.C.

> yelled at him and he got mad, so he got up and he like tried to hit me, so I smacked him in his face I think — yeah, it was in his face or in his arm, and then he end up like backing back. He didn't do nothing. My brother started grabbing him. And then my brother let him go. He went into the kitchen and got a knife, came back with a knife pointing up. My brother was going to hold him back, but he was scared because he was holding a knife. And then my cousin, he got close to me so I ended up smacking him and I caught his hand and I held him down on the couch and my brother picked up the knife and put it back. Then I let my cousin go and he went in my uncle's room.

{¶ 24} D.C. explained that when he smacked N.C., he slapped him with an open hand and that caused N.C. to drop the knife. D.C. claimed that he smacked N.C. from side-to-side and the hit landed on N.C.'s right arm. However, he "wasn't even trying to hit him in his arm. [He] was trying to hit him like in his stomach, but he was like running so it just hit him wherever he ran into." Additionally, D.C. hit

N.C. with an open hand on the chin. D.C. recalled hitting N.C. a total of three times, twice on his arm and once on his chin. However, D.C. also testified that he hit N.C. a total of five times, all with an open hand.

{¶ 25} D.C. reiterated what happened that evening. According to D.C., the events were as follows: N.C. slapped D.C. on the neck, D.C. yelled at N.C., N.C. got up and tried to hit D.C., D.C. hit N.C. in the arm and chin, N.C. got a knife, N.C. pointed the knife at D.C., N.C. came towards D.C. with the knife and D.C. smacked the knife out of his hand, D.C. held N.C. down, and C.C. grabbed the knife before putting it away. After the knife was put away, D.C. "let [N.C.] go."

{¶ 26} When N.C. left the room, D.C. "heard banging * * * like something was hitting the wall" before N.C. came back out and eventually left again.

{¶ 27} D.C. explained that N.C. had bothered him in the past, "but it didn't get to like how it was that day." N.C. "seemed hurt" after D.C. hit him, elaborating that he thought N.C. was hurt because N.C. got the knife. "Like for him to go get a knife on me because he doesn't — well, he gets real mad and he does stuff like that, but he never really did that to me because I don't really hit him unless it gets to a point like I was. I just usually talk to him and then he calms down."

{¶ 28} According to D.C., he never put on boxing gloves that day. Additionally, the only time the boxing gloves were used was when N.C. and C.C. used them. "[T]hey was hitting each other with the boxing gloves, but nobody was like hurt." D.C. described it was "just playing."

### C. Law and Analysis

{¶ 29} D.C. raises the following single assignment of error: "the lower court lacked sufficient evidence to convict defendant of felonious assault." We note that D.C. was not convicted of felonious assault but was adjudicated delinquent of felonious assault. Further, he was not a defendant; D.C. was an alleged delinquent child in juvenile court.

{¶ 30} "When reviewing the sufficiency of the evidence in a juvenile context, we apply the same standard of review applicable to criminal convictions." *In re L.R.F.*, 2012-Ohio-4284, 977 N.E.2d 138, ¶ 12 (8th Dist.), citing *In re Watson*, 47 Ohio St.3d 86, 91, 548 N.E.2d 210 (1989).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution." *State v. Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, ¶ 11.

{¶ 31} D.C. was adjudged delinquent of felonious assault pursuant to R.C. 2903.11(A)(1), which provides, "No person shall knowingly * * * [c]ause serious

physical harm to another * * *."  Pertinent to this appeal, R.C. 2901.01(A)(5) defines

serious physical harm to persons as:

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 32} Because we find it dispositive of this appeal, we first consider whether

the state presented sufficient evidence of serious physical harm.  Although the term

serious physical harm is defined in the statute, "[t]he degree of harm that rises to

the level of 'serious' physical harm is not an exact science, particularly when the

definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.'"

*State v. Irwin*, 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996, ¶ 37, quoting

R.C. 2901.01(A)(5).

{¶ 33} To demonstrate serious physical harm, the state "must establish one

of the factors in R.C. 2901.01(A)(5)(a)-(e), such as permanent incapacity, temporary

substantial incapacity, acute pain of such duration as to result in substantial

suffering, or any harm that results in prolonged pain." (Citation omitted.)  *State v.*

*Battles*, 8th Dist. Cuyahoga No. 109265, 2021-Ohio-310, ¶ 16 (finding sufficient

evidence of serious physical harm when the victim suffered from a concussion, a loss

of consciousness, constant light headaches, inability to drive for nine months, issues

with balance and vision, and a mark under his eye).

{¶ 34} Temporary, substantial incapacity and, therefore, serious physical harm under R.C. 2901.01(A)(5)(c), may be shown by establishing a loss of consciousness. *See, e.g., State v. Chambers*, 8th Dist. Cuyahoga No. 99864, 2014-Ohio-390, ¶ 23. Other courts have found the following evidence sufficient to constitute temporary, substantial incapacity: the inability to work; a police officer's diminished vision when assailant needed to be apprehended; the need for two knee surgeries, a knee immobilizer, and physical therapy; and a five-day hospital stay. *See State v. Garner*, 2d Dist. Darke No. 2019-CA-10, 2020-Ohio-4234, ¶ 19; *State v. Browning*, 190 Ohio App. 3d 400, 2010-Ohio-5417, 942 N.E.2d 394, ¶ 38 (4th Dist.); *State v. Bigsby*, 7th Dist. Mahoning No. 12 MA 74, 2013-Ohio-5641, ¶ 32; *State v. Winston*, 71 Ohio App.3d 154, 160, 593 N.E.2d 308 (2d Dist.1991). *See also State v. Littlejohn*, 8th Dist. Cuyahoga No. 95380, 2011-Ohio-2035, (finding serious physical harm under R.C. 2901.01(A)(5)(c) and (e) when one victim suffered from disorientation, blurred vision, bruises that persisted for weeks, persistent headaches, and an inability to work for one month and the other suffered from bruising, lacerations, an inability to work, and required x-rays, a tetanus shot, and physical therapy).

{¶ 35} In assessing whether the harm suffered by a victim involved the type of pain contemplated by R.C. 2901.01(A)(5)(e), this court has looked to the Committee Comment of the statute. "The Committee Comment, as it pertains to this definition, describes the pain as 'pain which is unbearable or nearly so, though short-lived, and pain which is long-lasting or difficult to relieve, though not as

keen.'" *State v. Sharp*, 8th Dist. Cuyahoga No. 87709, 2006-Ohio-6413, ¶ 25, (finding insufficient evidence of serious physical harm when "[t]here was no testimony as to the severity of the pain suffered by [the victim] or as to the duration that she suffered from actual pain."), quoting R.C. 2901.01(A)(5)(e).

{¶ 36} This court has recognized "that seeking medical treatment alone is not dispositive of serious physical harm." *State v. Clopton*, 8th Dist. Cuyahoga No. 95297, 2011-Ohio-2392, ¶ 16. "This district has not affirmed a conviction based on a fact pattern where the victim seeking medical treatment is the only evidence establishing the serious physical harm." *Id.* at ¶ 16.

{¶ 37} This court has also considered whether the victim needed medical treatment, rather than whether the victim sought medical treatment, in assessing whether the victim suffered "serious physical harm." In *Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, at ¶ 20, this court noted that "[g]enerally, a trial court does not err in finding serious physical harm where the evidence demonstrates the victim sustained injuries necessitating medical treatment." There, the victim's injuries — cuts, scrapes, and a concussion — met the requirements of R.C. 2901.01(A)(5)(c), temporary substantial incapacity, and (e), any period of prolonged pain. After the assault,[1] the victim was transported to the hospital where he remained for several hours before being released to his parents' care, suffered fits of vomiting throughout the evening, and experienced headaches for several days.

---

[1] The assault in *Davis* included the defendant kicking the victim in the head repeatedly and the victim's head striking a steel fence post.

*See also State v. Rogers*, 8th Dist. Cuyahoga No. 105897, 2018-Ohio-3495 (sufficient evidence of serious physical harm where the victim testified regarding the pain he experienced and the medical treatment he received for, among other things, PTSD, even though the state did not introduce medical records or testimony confirming the victim's diagnosis or treatment).

{¶ 38} In analyzing the sufficiency of evidence of felonious assault, this court has not found the fact the victim sustained a concussion alone dispositive, even while recognizing that "[m]any appellate districts have found that a concussion satisfies the serious physical harm threshold." *Rogers* at ¶ 39. In *Rogers*, the state presented sufficient evidence of serious physical harm when it established that the victim suffered from a concussion, head trauma, "massive headaches" for days following the attack, a mark on his head, pain for weeks from bullets grazing his ankle, and PTSD. *Id.* at ¶ 42. *See also State v. Noah*, 8th Dist. Cuyahoga No. 110664, 2022-Ohio-1315 (finding sufficient evidence of serious physical harm when the victim required physical therapy and suffered from a concussion, redness to face and eye, abrasions on neck and face, a broken nose, vision and breathing difficulties, and recurring headaches); *State v. Simpson*, 8th Dist. Cuyahoga No. 107407, 2019-Ohio-2912 (finding sufficient evidence of serious physical harm when the victim suffered from a concussion, minor neck sprain, back contusion pain for several days following the incident, and continued periodic pain and stiffness); *Chambers*, 8th Dist. Cuyahoga No. 99864, 2014-Ohio-390 (finding sufficient evidence of serious physical harm when the victim suffered from a concussion, loss of consciousness,

broken ribs, broken zygomatic arch, hematomas in both eyes, blurred vision, was hospitalized overnight, and was prescribed morphine and painkillers); *State v. Grider*, 8th Dist. Cuyahoga No. 68594, 1995 Ohio App. LEXIS 5599 (Dec. 20, 1995) (finding sufficient evidence of serious physical harm when the victim suffered from a concussion, hemorrhaging in both eyes, lacerations that required stitches, black eyes swollen shut, blurred vision, bruises, abrasions, and had continued dryness in his eyes).

{¶ 39} Under the unique facts of this case, we do not find sufficient evidence in the record to establish that N.C. experienced serious physical harm as defined in R.C. 2901.01(A)(5). We acknowledge there was some evidence of physical harm, as distinct from the serious physical harm required for a felonious assault conviction. T.G. testified that N.C.'s diagnosis was consistent with her belief that he had a concussion and that he had a bruise, and N.C. testified that he was "hurt" and "depressed" after the incident with D.C. However, there was no evidence that N.C. suffered from serious physical harm. For example, there is no evidence that N.C. was incapacitated in any way, that he suffered from "acute pain of such duration as to result in substantial suffering," that he experienced "any degree of prolonged or intractable pain," that N.C. required or received any medical treatment, or that he experienced any loss of consciousness.

{¶ 40} Consequently, the state did not present evidence sufficient to establish that D.C. knowingly caused N.C. to suffer serious physical harm.

{¶ 41} Accordingly, D.C.'s sole assignment of error is sustained.

{¶ 42} Judgment reversed and remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, PRESIDING JUDGE

MARY J. BOYLE, J., CONCURS;
CORNELIUS J. O'SULLIVAN, JR., J., DISSENTS (WITH SEPARATE OPINION)

CORNELIUS J. O'SULLIVAN, J., DISSENTING:

{¶ 43} Respectfully, I dissent and would affirm the adjudication.

{¶ 44} As this court has recognized, the degree of harm that constitutes "serious" physical harm is not an exact science. *State v. Mason*, 8th Dist. Cuyahoga No. 109176, 2020-Ohio-4998, ¶ 11, citing *State v. Montgomery*, 8th Dist. Cuyahoga No. 102043, 2015-Ohio-2158, ¶ 11. The testimony and evidence in each case must be considered to determine whether sufficient evidence exists. In making that determination, we are required to assess whether, after viewing the state's evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus. I

disagree with the majority opinion that the evidence was insufficient to support a finding of serious physical harm necessary for a felonious assault adjudication.

{¶ 45} This court has recognized that seeking medical treatment alone is not dispositive of serious physical harm. *Clopton*, 8th Dist. Cuyahoga No. 95297, 2011-Ohio-2392, at ¶ 16. Although "serious physical harm" may involve an injury or condition of such gravity as would normally require hospitalization, the facts must establish one of the factors in R.C. 2901.01(A)(5)(a)-(e), such as permanent incapacity, temporary substantial incapacity, acute pain of such duration as to result in substantial suffering, or any harm that results in prolonged pain. *Id*. at ¶ 12-14, citing R.C. 2901.01(A)(5)(c) and (e).

{¶ 46} Sufficient evidence of serious physical harm has been found under circumstances where the victim was knocked temporarily unconscious, the victim's injuries were serious enough to cause the victim to seek medical treatment, and the victim suffered from persistent pain for months. *See State v. Redman*, 3d Dist. Allen No. 1-15-54, 2016-Ohio-860, ¶ 25-28.

{¶ 47} In *Davis*, 8th Dist. Cuyahoga No. 81170, 2002-Ohio-7068, this court found the state presented sufficient evidence of serious physical harm where the victim suffered multiple punches and kicks to his head and face, his head hit a steel post, he suffered a concussion as well as scrapes and cuts, he sought medical treatment and remained at the hospital for several hours, and he had fits of vomiting and experienced headaches for several days. *Id*. at ¶ 6-8 and ¶ 22-23; *see also Rogers*, 8th Dist. Cuyahoga No. 105879, 2018-Ohio-3495, at ¶ 41-46 (finding

sufficient evidence of serious physical harm where the victim sustained a concussion, headaches, and head trauma as a result of a blow to his head, and the victim testified that he received medical treatment for his injuries); *In re E.B.*, 3d Dist. Auglaize No. 2-17-21, 2018-Ohio-1683, ¶ 22-23 (finding sufficient evidence of serious physical harm where the victim suffered prolonged periorbital pain and headaches, as well as a concussion); *Littlejohn*, 8th Dist. Cuyahoga No. 95380, 2011-Ohio-2035, at ¶ 22-23 (finding sufficient evidence of serious physical harm where a victim, who was punched and kicked by the defendant, became disoriented and experienced blurred vision, sought medical treatment, and suffered prolonged headaches).

{¶ 48} At the time of the incident here, which occurred in September 2021, the victim was seven years old and appellant was almost 14 years old. The victim testified that appellant hit him multiple times on the side of head with a closed fist while wearing boxing gloves. The victim retrieved a knife from the kitchen because he was scared of appellant. However, the victim put the knife back because appellant "grabbed a chair" and the victim feared appellant was going to throw it at him and that would be "how [he'd] die." (Tr. 60.). After the attack, the victim went by himself into a bedroom and vomited. He testified that he felt dizzy and just went to bed. The victim testified that now he has "head problems." (Tr. 69.) The adjudicatory hearing took place in February 2022, approximately four months after the incident.

{¶ 49} The victim's mother testified that when she arrived at the grandmother's house the following morning to get the victim, it took the victim's father awhile to wake him up. The mother described that as unusual. When the victim's father eventually brought the victim to the mother, the father had to support the victim by holding him up. The victim had trouble negotiating the steps on his way out of the house. The mother testified that the victim was "not himself"; he appeared to be "off," and "disoriented." (Tr. 17, 19.)

{¶ 50} Upon closer examination of the victim, the mother saw that the victim had swelling and a large mark on the right side of his head and bruising under his eyes and right temple area. The mother realized that what she initially thought was dirt on the victim's clothing was dried up vomit. Having suffered a concussion herself, and through her work in a nursing home with concussed patients, she was concerned that the victim had a concussion and took him to the hospital. The mother testified that her suspicion was confirmed. She also filed a police report.

{¶ 51} Appellant denied wearing boxing gloves but nonetheless admitted that he hit the victim several times. The appellant testified that he hit the victim because the victim was "bugging" him. He acknowledged that the victim has bugged him in the past, "but it didn't get to like how it was that day." (Tr. 91.) When questioned as to whether he had ever hit the victim before, appellant responded, "No, not really." *Id.* The assistant prosecuting attorney pressed appellant on that issue, asking him "This is the very first time you've ever hit him?" Appellant responded, "Yeah, and hurt him." *Id.*

{¶ 52} I would find this evidence to support a finding of serious physical harm required for a felonious assault and would affirm the adjudication. The appellant admitted he hurt the victim. The victim's mother, who has medical training, thought the reports of being struck repeatedly about the head, swelling to the side of the head, black eye, vomiting, and days of sadness and fatigue were signs of a concussion. In actuality, they are signs of a possible traumatic brain injury ("TBI") and closed head injury. Symptoms of a TBI can be delayed and severe.

{¶ 53} I believe we are ignoring not so recent advances in medical evaluation of TBI when we limit evidence of "serious physical harm" to cases where more than a concussion occurs. The potential severity of closed head injuries warrants a reexamination of what it means under Ohio law to be "hurt" and the evidence required to demonstrate "serious physical harm." That is not necessary in this case as it is clear the seven-year old victim sustained serious physical harm when assaulted by his almost 14-year old cousin.

{¶ 54} I therefore respectfully dissent.